Timothy **FOSTER** and Tonya Foster, Plaintiffs,

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., Defendant.**

No. 3:92–CV–378–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Feb. 9, 1994.

Fred W. DeVore, III, DeVore & Acton, Charlotte, NC, for plaintiffs.

Ned A. Stiles, Golding, Meekins, Holden, Cosper & Stiles, Charlotte, NC, for defendant.

### MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, District Judge.

**THIS MATTER** is before the Court on cross-motions for summary judgment. Defendant's motion was filed on September 30, 1993 and Plaintiff's Memorandum in Support of Declaratory Judgment, which the Court will treat as a cross summary judgment motion, was filed September 30, 1993. The Court heard oral argument on these motions on January 7, 1994.

The parties have stipulated to the material facts in this case. Consequently, it is now for this Court to enter judgment as a matter of law.

### FACTUAL SUMMARY

Plaintiffs brought this declaratory judgment action under 29 U.S.C. § 1132 of the Employee Retirement Income Security Act (ERISA) challenging Defendant's denial of coverage for medical treatment arising out of pregnancy related complications attending the birth of Plaintiffs' daughter. Timothy Foster is a State Farm claims adjuster who was provided medical insurance under State Farm's medical insurance plan. Sometime before marrying Mr. Foster, Tonya Foster became pregnant with their child. She received medical treatment at least once in February of 1991 for her pregnancy.

On March 29, 1991, Mr. and Mrs. Foster were married and on April 7, 1991, Mr. Foster enrolled Mrs. Foster as an eligible dependent under his health insurance plan. Mrs. Foster's enrollment became effective as of March 29, 1991, the date of their marriage.

On June 26, 1991, Mrs. Foster was hospitalized for approximately one month to arrest a premature labor. This treatment consisted, at least in part, of placing Mrs. Foster on a Tarbutaline pump which provided her with a steady flow medication intended to arrest

the premature labor. On July 28, 1991, the Foster's daughter, Jenna Leigh Foster, was born. Thereafter, the Fosters submitted claims with State Farm requesting coverage for the hospitalization expenses.

The insurance policy at issue provides a maximum $2,000 coverage for a pre-existing illness which it defines as one "for which medical advice or treatment was ... received from ... a physician within 3 months prior to the effective date of coverage of the insured individual." Stipulated Exhibit A p. 4180. The policy defines an illness as "a bodily disorder or disease ... [including] pregnancy...." Stipulated Exhibit A p. 4170.

In a letter dated September 11, 1991, State Farm refused to fully cover the Fosters' claims and instead paid $2,000 (the maximum permitted under the Plan for expenses resulting from pre-existing conditions) towards the expenses incurred by the labor arresting treatment. State Farm refused to pay the remainder claiming that Mrs. Foster's pregnancy was a pre-existing condition within the meaning of the Plan. State Farm acted as both provider and administrator of the health Plan under which it denied coverage.

On January 31, 1992, Mr. Foster again asked State Farm to cover his expenses and sent State Farm a copy of Dr. Larry Craddock's (her treating physician's) letter, which stated that the treatment "was totally to help prevent premature labor" and as such, "could be construed as solely for the benefit of the unborn child, Jenna, and not for the direct care of Tonya Foster." Stipulated Exhibit F. State Farm, in a February 18, 1992 letter, replied by stating, "While this may be true, the services were rendered to [Mrs. Foster] for treatment of complications of her pregnancy." Stipulated Exhibit G. State Farm has offered neither an expert opinion, nor an affidavit refuting Dr. Craddock's medical evaluation of the treatment at issue or the conclusion that it was for Jenna's benefit.

On February 26, 1992, Mr. Foster requested a specific explanation of State Farm's decision to deny full coverage. State Farm responded in a March 3, 1992 letter which reaffirmed its coverage denial under the pre-existing conditions limitation claiming the treatment was for Mrs. Foster and therefore pre-existed her coverage and that before her birth, Jenna Foster was not an eligible dependent within the meaning of the Plan.

On August 25, 1992, Mr. Foster requested that State Farm conduct an ERISA review of its claim denial decision. State Farm reviewed its denial and affirmed it on September 17, 1992. This action followed.

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides,

> ... judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (West 1993).

Summary judgment must be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id., Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). To attain summary judgment, the movant bears an initial burden of demonstrating no genuine issues of material fact are present. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who must point out specific facts which create disputed factual issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, district courts must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds could recognize as real factual disputes." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence from the entire record could not lead a rational fact finder to rule for the non-moving party. *Matsushita Electric Industrial Co.,* 475 U.S. at 587, 106 S.Ct. at 1356, *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (1986).

## ANALYSIS

### 1) Standard of Review

■ Initially, this Court must determine the standard of review to apply to the administrator's denial of benefits. In *Firestone Tire and Rubber Co. v. Bruch,* the Supreme Court held that, "a denial of benefits challenged [under ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). In this case, State Farm was the plan underwriter and its designated administrator. As the administrator, State Farm was given discretion "to construe and interpret the plan whenever necessary to carry out its intent ..." and thereby to make eligibility determinations. Stipulated Exhibit A pp. 4080 and 4085. Consequently, the *de novo* standard of review does not apply to this case.

■ Where, as here, an ERISA administrator is given discretion to interpret and implement the meaning of a benefits plan, its denial of benefits is typically reviewed under an arbitrary and capricious or abuse of discretion standard. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). However,

under *Firestone,* "if a benefit plan gives discretion to an administrator ... who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.,* 489 U.S. at 115, 109 S.Ct. at 956 (quoting Restatement (Second) of Trusts § 187 comment d (1959)).

The Fourth Circuit has recently elaborated upon the *Firestone* decision. In *Doe v. Group Hospitalization & Medical Services,* the Fourth Circuit said "that when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate." *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 87 (4th Cir.1993). In such circumstances, "the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Id.*

■ To determine whether the abuse of discretion standard or the *Doe* standard is to apply in this case, the Court must first determine whether a conflict of interest is presented by the administrator's role as both a fiduciary of the plan and an employee of the plan provider. The Court finds the administrator here was called upon to make its coverage decision in an environment which placed it in a conflict between its duty to minimize State Farm's costs and its fiduciary duties to those covered by the Plan. Indisputably, the administrator in this case was torn between two masters; its employer, State Farm, and ERISA's mandate that fiduciaries act "solely in the interest of beneficiaries...." 29 U.S.C. § 1104(a)(1)(A, B).

The tug of war between these competing interests called upon the administrator to reconcile its duty to minimize costs to its employer, and construe the Plan in a manner that would protect the interests of beneficiaries. As the *Doe* Court recognized, "Even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the interest of the plan, leaving beneficiaries less protected than when the trustee acts without self-interest

and solely for the benefit of the plan." *Id.* at 86, 87. Although the facts of this case indicate no reason to believe the administrator labored under a conscious conflict of interest, the conflict was inherently presented by the dual roles it was called upon to fulfill. Consequently, because in this case State Farm acted as both the fiduciary and coverage provider, the Court will apply the standard of review the Fourth Circuit mandated in *Doe.*

In applying this standard, the Court must review the administrator's decision with that degree of deference necessary to counterbalance any "untoward influence" presented by the conflict. *Id.* at 87. That is, the Court must "review the merits of the [administrator's] interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiary." *Doe,* 3 F.3d at 87. Thus, the Court must determine if the administrator faithfully executed its duty to interpret the Plan "solely in the interests of the participants and beneficiaries ... for the purpose of providing benefits [to them] ... with the care, skill, prudence, and diligence under the circumstances prevailing that a prudent man acting in like capacity ... would use ..." despite the conflict. 29 U.S.C. § 1104(a)(1)(A, B).

### 2) The Administrator's Decision

#### A) Preliminary Observations

 State Farm argues "... the Plaintiffs' claim that once the fetus became viable, pregnancy complications treatment was actually for Jenna Leigh Foster, not for Tonya Foster, and that, as a 'newly acquired' dependent, Jenna Leigh Foster was eligible for coverage as a viable fetus *in vitro* (sic) ...", is contradicted by the Application for Dependent Group Medical Coverage signed by Timothy C. Foster on August 7, 1991. The Court disagrees. In the Application, Mr. Foster acknowledged Jenna Leigh Foster, born July 28, 1991, was "eligible on the date of birth." That paragraph on the Application for Dependent Group Medical Coverage provides a space to place a check mark in a box by the sentence "child eligible on date of birth (never married children eligible until end of year in which they reach age 23 or

become employees or agents of State Farm)."

The Court finds no provision in the Plan incorporating either the *Application* or this specific provision within it as part of the Plan, and State Farm directs it to no such Plan provision. Defendant argues that "... this acknowledgement is consistent with State Farm's *intent* under the Plan and with State Farm's reasonable benefits determination in this matter." (Emphasis added). But whether or not this is consistent with State Farm's intent is irrelevant unless State Farm's subjective intent is made relevant by its inclusion somewhere in the Plan. This is nothing more than a circular argument that State Farm intended what it intended. The difficulty with State Farm's position is that this "intent" was never specifically included in the Plan. State Farm's subjective intentions are simply irrelevant to this case. Nothing in the Plan limits the word "acquired" used in ¶ 4115 of the Plan to birth. That Plan provision states:

> Once you are enrolled for Dependents' coverage, newly acquired Dependents will be covered on the date acquired if written notification is provided and any required premium is paid."

Since the Court finds no provision in the Plan which incorporates the Application into the Plan, or makes birth a precondition to coverage under the Plan, it can find no reason to conclude that coverage for acquired dependents is conditioned by the Plan upon birth. The Application states that Jenna's birth date was July 28, 1991 and that Jenna was eligible on that date. But it does not follow from this that she was ineligible before birth. The Plan does not state she was eligible only on her date of birth, but instead states that "... newly acquired Dependents will be covered on the date acquired if written notification is provided and any required premium is paid." (Defendant Exhibit "A", ¶ 4115).

The Defendant cites *Smith v. Commonwealth Edison Mutual Benefit Association* 1987 WL 5697 (N.D.Ill.1987) to support its argument. That decision held a child, born some three months after coverage terminat-

ed, was not an eligible dependent as a fetus *in vitro* (sic) and thus was not entitled to coverage for medical expenses incurred as a result of his premature birth. The Defendant argues the language of the ERISA plan there "... was in many respects quite similar to the language of the Plan at issue here...." The Court disagrees.

The difficulty with State Farm's position is that the Plan did not include a definition of "acquired" which excluded a child at any moment before birth. Furthermore, this Court does not accept the language in the policy before the *Commonwealth* court was "... in many respects quite similar to the language of the Plan at issue here." In *Commonwealth*, the court on page 2 said:

> The plan defines dependents as "unmarried children of any marriage, under 19 years of age." Plan, Article I(2). In addition to an employee's own children, dependents include adopted and step children who rely on the employee for support and live with the employee in a "regular parent-child relationship." Plan, Article I(2). See also, Plan Article I(2)(B) and Article IV, § C(3) (referring to "unmarried children"); Article III, § A and § B(2)(4) (fixing employee's notification requirement for new dependents to "within 31 days after the child's birth"). Because dependency status is fixed at birth, newborns, not fetuses, are covered dependents under the plan.
>
> Moreover, the summary of the plan, which was provided to Mr. Smith and is included in the plaintiffs' appendix, states at page 6 that: "Children are added ... on the date of birth." This summary, while not controlling, adds to the persuasive and uncontradicted evidence that Richard Smith, Jr. was not a dependent under the plan.

The Plan in *Commonwealth* very clearly stated: "children are added ... on the date of birth." Once again, the Plan at issue here provides only that:

> Once you are enrolled for Dependents' coverage, newly acquired Dependents will be covered on the date acquired if written notification is provided and any required premium is paid.

> If you are not enrolled for Dependents' coverage, newly acquired Dependents will be covered on the date acquired if written notification is provided within 31 days of the date acquired and any required premium is paid.

There is no mention of birth, but of "newly acquired dependents."

State Farm in its "Memorandum in Support of its Motion for Summary Judgment" on pages 5 and 6 argues:

> Indeed, if the Plaintiffs' position were accepted, a newborn child, perhaps with serious medical complications, could unwittingly be deprived of necessary coverage under the Plan. For example, the Plan provides that "[if] you fail to enroll your Dependents within 31 days of the date you first become eligible for Dependents' coverage, evidence of insurability will be required and coverage will not become effective until the first day of the calendar month coincident with or next following approval of such evidence of insurability." Stip. ¶ 6, Ex. A at 4110–15. If an employee quite reasonably believes that he/she first becomes eligible for dependents' coverage by virtue of the birth of a child, and enrolls the child for dependents' coverage within 31 days of the date of the child's birth, that child will not be eligible for dependents' coverage without evidence of insurability, if that child were considered, as a fetus *in vitro*, to have been eligible at viability. In such a case, proof of insurability would be required because, while enrollment would have been sought within 31 days of birth, it would not have been sought within 31 days of eligibility for dependents' coverage (i.e., viability of the fetus).

However, the Court will not decide the facts of this case upon the facts of some hypothetical parade of horribles. The Court must decide under the facts before it. The answer to this argument is that in this instance according to Plaintiffs' Memorandum (p. 2) in Support of Summary Judgment, Mr. Foster on April 7, 1991 completed an application for Dependent Group Medical Coverage and Mrs. Foster immediately became an enrolled eligible dependent under it by virtue of being the spouse of the employee. Under

¶ 4115 of the Plan "Once you are enrolled for Dependents' Coverage newly acquired Dependents will be covered on the date acquired if written notification is provided and any required premium is paid." The Plaintiffs argue that Jenna was acquired before she received medical treatment while yet unborn, since nowhere in the Plan is "newly acquired dependent" defined. The Court agrees that this is consistent with the Plan's express provisions. The Foster's had dependents coverage before Jenna was born and gave the notice, which was not given with a time requirement, requesting coverage after she was born.

The Defendant further argues that State Farm "... does not intend, and has never intended, that a fetus *in vitro*, viable or otherwise, is prior to birth an eligible dependent under the Plan." But again, State Farms intent only counts if it somehow manifests it in writing in the Plan.

The Defendant argues on page 6 that because all health care providers repeatedly claimed that the patient undergoing treatment was Tonya Foster that the Plaintiffs would not be entitled to Plan benefits, since it was Tonya Foster, and not the fetus "*in vitro*" (sic) who was the patient. In support of that position, the Defendant attaches as Exhibits copies of Group Medical Insurance Claim Forms, bills, State Farm correspondence naming Tonya Foster as "Patient", a Physician Plan of Treatment Form, and a State Farm Explanation of Benefits naming Tonya as the "patient." None of these documents change the fact that the only medical evidence is that the treatment with the Tarbulatine Pump could be construed to be solely for the benefit of the unborn child, Jenna. Indeed, these exhibits only make more compelling the utter absence of any scientific evidence to contradict the Plaintiff's position that it was Jenna who was treated, not her mother.

### B) The Decision and the Plan

■ The undisputed medical testimony is that the treatment rendered to Mrs. Foster "was totally to prevent premature labor ... [and] could be construed as solely for the benefit of the unborn child." Stipulated Ex-

hibit F, p. 12. The Court finds the treatment not only could be so construed, but was in fact for Jenna Foster's benefit. Defendant has not come forward with either an affidavit or other admissible form of evidence to contest the only medical evidence now before the Court which indicates the treatment benefitted Jenna alone. Therefore, the Court finds as a fact that the treatment dispensed to Mrs. Foster during the month following June 26, 1991 was solely for the benefit of Jenna Foster, not her mother. Common knowledge indicates a mother normally has no interest in a delayed labor and prolonged pregnancy except perhaps that which any decent mother would have for the sake of her child's health. It is the unborn child who has an interest in a sufficiently long period of life *in utero* to avoid complications caused by a premature birth.

However, the fact that the treatment was given to Jenna through her mother does not resolve the question of whether the treatment came within the pre-existing illness limitation. Clearly, if the treatment was for Mrs. Foster, then it would come within the pre-existing illness limitation because it was necessitated by pregnancy which the Plan defined as a pre-existing illness. Yet, the treatment was administered to Mrs. Foster for Jenna. Usually, it is the beneficial recipient of a treatment who is considered the treated patient. The Court finds no reason to conclude otherwise in this case.

Since it was Jenna who was treated through her mother, the question is not did Mrs. Foster have a pre-existing condition, but instead, did Jenna. Obviously, Jenna was not pregnant and no other evidence before the Court indicates she was ill at any time prior to June of 1991. The treatment benefitting her, and received by her through her mother, was not for a pre-existing illness but instead remedied a present condition attending premature birth—underdeveloped lungs. Consequently, that treatment does not come within the Plan's pre-existing illness limitation because Jenna Foster was neither pregnant nor ill any time prior to her coverage.

■ It thus remains for the Court to review the administrator's conclusion that Jenna was not covered under the Plan at the time of her treatment during the month following June 26, 1991. Plaintiffs contend the administrator breached its fiduciary duty to beneficiaries by refusing to pay benefits to their baby under the Plan's acquired dependent provision for the treatment she received prior to her birth. Defendant contends that duty was not breached because Jenna Foster did not become an acquired dependent under the Plan until after her birth and thus after the treatment in question was rendered. Resolution of this dispute requires the Court to determine whether the administrator wrongly concluded under the Plan that Jenna's birthday was the date at which she became an acquired dependent.

The Plan provides coverage for employee's and their dependents. A dependent is defined as either "an Employee's spouse or ... child...." Stipulated Exhibit A, p. 4100. The Plan lists three categories of dependent children it covers. The first category covers unmarried children under 23 years of age supported by the employee. Of course, if Jenna was a child when treated or at least prior to her birth, then she would clearly be covered under this provision. The second category covers "after acquired children" which includes, but is not limited to, stepchildren, legally appointed foster children and legally adopted children under 23 years of age. The third category includes disabled children incapable of providing for their own living.

Yet, the Plan does not define the term "acquired" and specifically says nothing expressly about birth as the time which a dependent becomes acquired. In fact, the Plan assumes there are other times, such as adoption or marriage, when a child may become acquired. The Plan nowhere expressly limits coverage to born persons. The fact that the Plan contemplates means of acquiring a dependent other than birth does not counsel that birth is the only means of acquiring a dependent. Instead, it counsels that acquiring is clearly broader than birth. Moreover, the fact that the Plan contemplates coverage for born persons does not lead to the infer-

ence it excludes coverage for unborn persons. Therefore, State Farm's contention that the administrator rightly construed this Plan begs the question: Was there something inherent in the Plan that made it preferable to place the date a child is acquired at birth rather than sometime prior to birth? The Court believes the term "acquired" within this Plan is ambiguous. When faced with an ambiguity, in determining whether a decision has been made solely for the benefit of the participants,

> [a court] must take account of the principle that in making a reasonable decision, ambiguity which remains in the scope of the ... language must be construed against the drafting party, particularly when, as here, the contract is a form provided by the insurer rather than one negotiated between the parties. *Doe,* 3 F.3d at 88, 89.

■ The ERISA plan administrator's duty to construe ambiguity against the drafter is also coupled with its duty to interpret trust documents "in light of ERISA's policies...." *Central States v. Central Transport, Inc.,* 472 U.S. 559, 568, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447 (1985). As previously mention, one of ERISA's policies is "providing benefits to participants and their beneficiaries...." 29 U.S.C. § 1104(a)(1)(A)(i). Thus, the Court must decide if the administrator properly determined, free of conflict, that Jenna became an acquired dependent, within the meaning of the Medical Coverage Plan, only after her birth, and if the treatment given to her was covered by the Plan. The Court concludes the administrator's determination was more likely compelled by the conflict of interest it labored under than anything within, or logically compelled by the Plan itself. Indeed, given the peculiar facts of this case, the administrator had no more reason to prefer birth as the date a dependent became acquired than sometime prior to birth except that it saved the administrator's employer money.

This conclusion is underscored by the arbitrariness, under the administrator's construction of the Plan, of placing birth as the date when a child is acquired. State Farm admits it would have covered the costs incurred for Jenna's treatment if she had been born pre-

mature and artificially incubated but not if she was born at a safe stage of gestation and naturally incubated. If Jenna can be acquired prior to nine months of gestation if born, what logical reason is there to conclude that she cannot be an acquired dependent prior to nine months gestation if unborn. Nothing within the Plan indicates an administrator should conclude a child has been acquired if artificially incubated but not if naturally incubated. Birth is not a magical event in the life of a human person which transforms it from the world of nonpersons. to the world of persons. Birth is clearly not designated as such a time within this Plan.

State Farm conceded at oral argument that paying for artificial incubation in an intensive care unit could have cost it in excess of one hundred thousand dollars. However, the Foster's chose a treatment which avoided this life risking, costly course and instead chose to naturally incubate their child at a cost of less than twenty thousand dollars—approximately one fifth the cost of treatment for a premature birth. Nothing about the Plan itself indicates why one form of treatment would be preferable over the other.

The Plan, according to State Farm, put these parents to the impossible choice between choosing to risk their child's life and have coverage, or opting for a more prudent course, avoiding endangerment to their child's life, and having next to no coverage. It is surely counter-intuitive to think it was sensible for State Farm to ask the Foster's to endanger their child's life if they wanted coverage.

It is the Court's duty to review this decision with an eye toward counter-balancing the conflict inherent in the administrator's decision. In so doing, this Court is faced with, "a discretionary interpretation ... not entitled to the deference ... otherwise accord[ed]...." *Doe* 3 F.3d at 89. This requires the Court to "construe the contract for the benefit of its beneficiaries and enforce the coverage ... not otherwise explicitly excluded." *Id.* In construing the Plan in light of the inherent conflict presented by these facts, the Court is mindful that,

Under the common law, a fiduciary may be authorized to act despite a conflict of interest by the terms of the trust instrument. *See* Restatement (Second) of Trusts § 170(1) comment a. But this consent does not mean that the fiduciary's judgment will not be scrutinized more closely than when he acts solely in the interest of the beneficiaries. Even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interests of the plan, leaving beneficiaries less protected than when the trustee acts without the self-interest and solely for the benefit of the plan. As noted in *Firestone*, these same principles apply in the ERISA context, and a conflict of interest environment is thus a factor to be considered in determining whether authorized discretion has been abused. *Doe* 3 F.3d at 86, 87 (citations omitted).

Therefore, since it was reasonable under the Plan to do so, and the administrator had a duty to construe the Plan if possible to provide benefits to beneficiaries, the Court finds under this Plan that an acquired dependent under these facts should have been construed to include Jenna Foster.

The Court finds Jenna Foster was both an acquired dependent and a child within the meaning of the Plan. The Plan defines a dependent as "an Employee's never married child until the end of the calendar year in which the child attains twenty three years of age." Stipulated Exhibit 1, p. 4100. Clearly, Jenna was an unmarried child younger than 23 at the time she was treated through her mother. There is nothing intrinsically special about passing through the birth canal which makes a human offspring a child. Birth changes where one is, not what one essentially is. The only difference between Jenna one month prior to her birth and on the date of her birth was her location and maturation, not her nature as a child.

Jenna became an acquired dependent under the Plan, at the least, on the date she became in need of medical treatment, and more likely when her father and mother were married. The Court need not determine the exact date she became acquired since it is enough to conclude the Fosters' acquired a

child, and that this child became acquired under the Plan, at least before she needed the treatment at issue here.[1] In discussing fetal development, the Merck Manual acknowledges that from the date of conception "[t]he heart begins to pump plasma through the vessels on day 20." The Merck Manual, 1709 (Robert Berkow, M.D., et al. eds., 14th ed. 1982). At eight weeks of gestation, brain activity has been observed. Flower, M.J., Neuromaturation of the Human Fetus, 10 J.Med.Philos. 237–351 (1988), and Goldenring, J.M., Development of the Fetal Brain, 307 N.Eng.J.Med. 564 (1982). Anesthesia is used during fetal surgery as early as 18 weeks because the fetus feels pain. Levine, A.H., Fetal Surgery 54 Aorn 17–19, 22–27, 27–30, 30–32 (1991); Strickland, R.A. *et als.*, Anesthesia, Cardiopulmonary Bypass and the Pregnant Patient, 66 Mayo Clin.Proc. 411–429 (1991); Rosen, M., Anesthesia and Monitoring for Fetal Intervention, *in* The Unborn Patient, 2nd. edited by, M.R. Harrison, 172–181. Spontaneous movement of the unborn child begins between six and seven and one-half weeks gestation. de Vries, J.I.P., Visser, G.H.A., and Prechtl, H.F.R., The Emergence of Fetal Behavior, 7 Early Hum.Dev. 301–322 (1982). Obviously, at all times during gestation, the fetus ingests food and metabolizes oxygen. At the time her parents were married, her mother had been pregnant eighteen weeks and was well into her second trimester. Whatever else we might call a human at eighteen weeks of gestation, and whatever else the Foster's acquired under their ERISA plan, it was also essentially a child.[2] Plainly, in the absence of language in the Plan stating to the contrary, it was irrational, and scientifically insupportable, for the Administrator to conclude that Jenna was anything but a newly acquired dependent under the Plan.

■ State Farm argues that even if Jenna Foster was the beneficial recipient of the treatment, and a newly acquired dependent under the Plan, the treatment itself was not covered by the Plan. The Plan provides that "[b]enefits are payable if an insured individual incurs Eligible Charges ..." and defines eligible charges as "[t]hose charges incurred by an insured individual as a result of an

---

1. The plan also provides that "[o]nce you are enrolled for Dependent's coverage, newly acquired Dependents will be covered on the date acquired if written notification is provided and any required premium is paid." Stipulated Exhibit A p. 4115 According to the stipulated statement of fact, on April 7, 1991, Mr. Foster applied for dependents' coverage for his wife which became effective on March 29, 1991, the date of their marriage. On August 7, 1991, Mr. Foster applied for dependent coverage for Jenna Leigh Foster in his "Application for Dependent Group Medical Coverage" which became effective, according to the plan, "on the date [she was] acquired." Stipulated Exhibit 1, p. 4115. Mr. Foster also, indisputably, paid the required premiums for dependent coverage. Mr. Foster was enrolled for Dependents' coverage prior to providing State Farm with written notification of a newly acquired dependent on August 7, 1991. Consequently, under the plan, Jenna's coverage began on the date she was "acquired," which could reasonably have been sometime prior to her birth.

2. In 1981, the Subcommittee on Separation of Powers of the Judiciary Committee of the United States Senate published a report which specifically found, as a matter of scientific fact, that human life begins at conception. That report stated,

> The testimony of these witnesses and the voluminous submissions received by the subcommittee demonstrate that contemporary scientific evidence points to a clear conclusion: *the life of a human being begins at conception ...* today the facts are beyond dispute. Physicians, biologists, and other scientists agree that conception marks the beginning of the life of a human being ... there is overwhelming agreement on this point in countless medical, biological, and scientific writings. Report on Human Life Bill, Subcommittee on Separation of Powers, Committee on the Judiciary United States Senate (97th Cong., 1st Sess.1981) p. 7. (emphasis added).

The Senate Subcommittee went on to to observe, Those witnesses who testified that science cannot say whether unborn children are human beings were speaking in every instance to the value question rather than the scientific question. No witness raised any evidence to refute the biological fact that from the moment of conception there exists a distinct individual being who is alive and is of the human species. No witness challenged the scientific consensus that unborn children are "human beings," (meaning) living beings of the human species. Rpt., Human Life Bill, supra. at 11.

Indeed, there is not one single reference in the scientific literature known to this Court, and certainly none offered by Defendant, which refutes the statement that humans are genetically distinct and complete from their parents at the moment of conception.

illness ... which [is] Necessary Treatment of an illness...." Stipulated Exhibit 1 4025 and 4160. A Necessary Treatment is one, "recommended by a Physician ... commonly and customarily recognized throughout the Physician's profession ... [and] determined to be of proven effectiveness by the appropriate National Scientific Organization related to the diagnosed illness." *Id.* at 4175.

The necessity of the treatment rendered to Jenna is not in dispute. Rather, it is disputed that Jenna had an illness within the meaning of the Plan. The Plan defines an illness as "[a] bodily disorder or disease ... [and] pregnancy...." *Id.* at 4170. The Plan also recognizes "well baby nursery care will be considered on the same basis as charges incurred in connection with an 'illness.'" The Court finds this treatment of an illness, and Defendant's argument in support of it, is nothing short of bizarre. Under the Plan, a pregnant mother carrying a child is ill, but what creates this illness—a child *in utero*—may not be treated unless it is a well baby in which case even though well, she will be covered for treatment as though she were ill only if she is also born. Therefore, a baby may both cause a covered illness and be treated as though ill even when well if only she is born. The Court believes that if a well baby can be covered when well as though ill, and create for her mother a covered illness, surely a treatment given to her mother for her benefit can come within the Plan's coverage of either well baby care or bodily disorders. A baby with under-developed lungs and other organs who receives treatment intended to stave off the ill-effects of premature birth is not a well baby and is therefore one who has received treatment for a bodily disorder. Either way, the Court believes the Plan, if it is to be rational, covers the treatment given to Jenna Foster through her mother. State Farm cannot both cover Jenna if she is a well born baby, but not an unborn baby with a bodily disorder which could result in death and prevents her from an early birth. State Farm cannot sensibly have it both ways under its Plan.

For the above enumerated reasons, the Court concludes the administrator did not act "solely in the interests of the participants and beneficiaries ... for the purpose of providing benefits [to them] ... with the care, skill, prudence, and diligence under the circumstances prevailing that a prudent man acting in like capacity ... would use ..." despite the conflict. 29 U.S.C. § 1104(a)(1)(A, B). Consequently, the Court grants Plaintiffs' summary judgment motion and denies Defendant's cross motion for summary judgment.

**NOW, THEREFORE, IT IS ORDERED** that Plaintiffs' motion for summary judgment be, and hereby is, **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's cross motion for summary judgment be, and hereby is, **DENIED.**

### JUDGMENT

**THIS MATTER** is before the Court on cross motions for summary judgment, filed by Plaintiff and Defendant on September 30, 1993.

**NOW THEREFORE,** in accordance with the Memorandum of Decision and Order filed simultaneously with this Judgment, IT IS ORDERED, **ADJUDGED, AND DECREED** that:

1. Plaintiff's motion for summary judgment is GRANTED.

2. Defendant's cross motion for summary judgment is DENIED.

3. Plaintiff shall recover from the Defendant the amount of $12,000 plus interest computed from the date this judgment is entered as provided for in 28 U.S.C. § 1961.

4. Each party shall bear its own costs.