Ethan L. BEDRICK, by and through his Guardian ad Litem; Stephanie W. HUMRICKHOUSE, as Guardian ad Litem; Richard E. Bedrick; Patricia W. Bedrick, Plaintiffs–Appellants,

v.

TRAVELERS INSURANCE COMPANY, Defendant–Appellee.

No. 95–2448.

United States Court of Appeals, Fourth Circuit.

Argued July 8, 1996.

Decided Aug. 26, 1996.

---

**150**

**ARGUED:** Charles Mark Holt, Edwards & Kirby, L.L.P., Raleigh, North Carolina, for Appellants. Kurt Eric Lindquist, II, The Sanford Law Firm, Raleigh, North Carolina, for Appellee. **ON BRIEF:** David F. Kirby, Tiana H. Irvin, Edwards & Kirby, L.L.P., Raleigh, North Carolina, for Appellants. Deanna L. Davis, The Sanford Law Firm, Raleigh, North Carolina, for Appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge HALL wrote the opinion, in which Judge RUSSELL and Judge WIDENER joined.

### OPINION

K.K. HALL, Circuit Judge:

Ethan Bedrick and his parents appeal an order of the district court granting summary judgment for the defendant insurer in this dispute over medical insurance benefits provided under an ERISA [1] welfare benefit plan. We affirm in part, reverse in part, and remand.

### I.

Ethan Bedrick was born January 28, 1992. His delivery went very badly, and he was asphyxiated. As a result, he suffers from severe cerebral palsy and spastic quadriplegia.

---

1. Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*

"Spastic quadriplegia" means that Ethan's motor function is impaired in all four limbs because of hypertonia. Dorland's Illustrated Medical Dictionary 1398, 1550 (28th ed.1994). Hypertonia is an abnormal resistance to passive stretching of the muscles. *Id.* at 802. Ethan also has exaggerated reflexes and asymmetries of posture.

The diabolical thing about hypertonia is that, unless properly treated, it can get much worse. Unless each hypertonic muscle is regularly stretched (and its abnormal resistance thereby overcome), the muscle itself changes. Long, flexible tissue is replaced by shorter, inflexible, fibrotic tissue. The resulting curled-up appendage is called a contracture. *Id.* at 373.

Preventing contractures is especially difficult for a hypertonic infant. The path of least resistance is not to stretch, and a helpless baby follows that path. An adult must actively exercise the child's limbs. For this reason, Ethan was put on an intense regimen of physical, occupational, and speech therapy.[2]

Travelers Insurance Company provides medical insurance to Ethan through an ERISA plan at his father's work. For a fixed premium from the employer, Travelers both funds and administers the plan, so it bears the financial consequences—and reaps the financial rewards—of its own coverage decisions.

When Ethan was fourteen months old, Travelers cut off coverage for speech therapy and limited his physical and occupational therapy to just fifteen sessions per year. This abrupt change was occasioned by a review of Ethan's case by Dr. Isabel Pollack, an employee of Travelers' ConservCo subsidiary. ConservCo performs "utilization review," i.e., it looks for places to cut off or reduce unnecessary services and thereby reduce the cost to Travelers.

Dr. Pollack called Ethan's pediatrician, Dr. R.L. Swetenburg, who told her that there was a "50/50 chance that [the] child will be able to walk by age 5." Ethan had a "poor prognosis[,] but [he] has shown some improvement [and] has some evidences of socialization[.]" She then called Dr. Philip Lesser, Ethan's pediatric neurologist, who stated that Ethan's "potential for progress is mild and that he would support whatever the physical therapist feels is necessary as far as home therapy by parents." Dr. Pollack thereupon determined, without contacting the physical therapist whose opinion Dr. Lesser supported, that "I feel that further therapy is of minimal benefit[,] and ... I cannot in good conscience suggest that we continue." Ethan's therapies were cut back sharply. Travelers also denied his claims for certain prescribed durable medical equipment, including a bath chair and an upright stander. Dr. Swetenburg, Dr. Lesser, and the physical therapist, Donna Stout Wells, later sent letters to Travelers to protest the precipitous drop in coverage. Dr. Pollack did not see any of these letters until her deposition.

The denial was finally reviewed in Travelers' home office in October 1993, and only after Mr. Bedrick threatened to sue. This review was conducted by Dr. Kenneth Robbins. Though many months had passed, he did not update the file or contact any of Ethan's physicians. Instead, based on his general experience and a single New England Journal of Medicine article from 1988, Dr. Robbins concluded that intensive physical therapy does not speed the development of children with severe cerebral palsy. Dr. Robbins also concluded that the prescribed bath chair was a "convenience item" not covered by the plan.

Ethan and his parents filed suit in state court on February 4, 1994, alleging breach of contract, bad faith, and unfair and deceptive trade practices. Travelers removed the suit to district court. The bad faith and trade practices claims were dismissed as preempted by ERISA, and the breach of contract claim was recharacterized as one for benefits under an ERISA plan. 29 U.S.C. § 1132(a)(1)(B).

---

2. Physical therapy was prescribed on a twice weekly basis, with occupational and speech therapy at twice per month.

After discovery, the parties filed cross-motions for summary judgment. The district court granted Travelers' motion.

## II.

██ The parties argue a great deal over the standard of review. Decisions by administrators of ERISA plans are generally subject to *de novo* review, *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), though, if the plan gives discretionary authority to the administrator, review is for abuse of discretion. *Id.; de Nobel v. Vitro Corp.,* 885 F.2d 1180 (4th Cir.1989). Here, there is no plan-wide grant of discretion to Travelers; however, the "medically necessary" restriction on benefits does involve an exercise of discretion:

The Travelers determines, in its discretion, if a service or supply is medically necessary for the diagnosis and treatment of an accidental injury or sickness. This determination is based on and consistent with standards approved by Travelers medical personnel. These standards are developed, in part, with consideration to whether the service or supply meets the following:

● It is appropriate and required for the diagnosis or treatment of the accidental injury or sickness.

● It is safe and effective according to accepted clinical evidence reported by generally recognized medical professionals and publications.

● There is not a less intensive or more appropriate diagnostic or treatment alternative that could have been used in lieu of the service or supply given.

A determination that a service or supply is not medically necessary may apply to the entire service or supply or to any part of the service or supply.

This language clearly purports to give Travelers the discretion to determine the "medical necessity" of treatment. The problem, though, is that every exercise of this discretion has a direct financial effect upon Travelers. There are two primary kinds of ERISA plans for health coverage: (1) employer-funded plans, where the "insurance company"

acts merely as processor and independent fiduciary administrator of the plan, and (2) insurer-funded plans, where, in exchange for a premium from the employer, the insurer processes and pays claims *and* acts as plan administrator. This case fits in the second category. Inasmuch as the law is highly suspect of "fiduciaries" having a personal interest in the subject of their trust, the "abuse of discretion" standard is not applied in as deferential a manner to such plans. *Firestone,* 489 U.S. at 115, 109 S.Ct. at 957 (fiduciary's conflict of interest "must be weighed as a 'facto[r] in determining whether there is an abuse of discretion'") (quoting Restatement (Second) of Trusts § 187 comment d).

██ Travelers concedes that it has a conflict of interest, but the parties debate what the conflict means. Travelers says its conflict is merely a "factor," citing the passage from *Firestone,* while the plaintiffs say that it changes the standard of review, citing this court's cases. *Bailey v. Blue Cross & Blue Shield of Virginia,* 67 F.3d 53 (4th Cir.1995); *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80 (4th Cir.1993). The premise of this dispute is that there is some difference between *Firestone* and *Bailey/Doe.* There is not. Our cases are interpretations of *Firestone,* and we apply *Firestone*'s "factor" in this manner:

"[W]hen a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict."

*Bailey,* 67 F.3d at 56 (quoting *Doe,* 3 F.3d at 87). Here, though the district court cited *Doe,* it then simply went into an ordinary

abuse-of-discretion analysis, albeit "[w]ith these considerations [*Doe* ] in mind[.]"

Another background legal point that bears on all issues here is ERISA's requirement of a "full and fair review" of all denied claims by an "appropriate named fiduciary." 29 U.S.C. § 1133(2); 29 C.F.R. § 2560.503–1(g); *see Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 157 (4th Cir.1993). Despite the Bedricks' protests, the denial of their claims was not referred to Dr. Robbins for Home Office Review until October 14, 1993, six full months after Dr. Pollack decided to sharply limit Ethan's therapy. The referral form is telling. It notes that the "[employee] says he is intending to sue," and that the field office "need[s] another opinion [and] support of H[ome] O[ffice]." Dr. Robbins conducted his "review" without supplementing or updating the file. Finally, there is evidence that his exercise of judgment is not disinterested. At his deposition, Dr. Robbins acknowledged that his job involved "support for the legal department" and "support work for medical directors in the field who have problem cases[.]" In sum, we are very skeptical that the Bedricks received a "full and fair review."

### III.

According to its answer to an interrogatory, Travelers' decision that Ethan's intensive program of physical therapy was not medically necessary "was based upon a finding that the specified treatments did not reach a level of potential for significant progress which would allow the therapies to be provided on a medically necessary basis."

There are several deficiencies in this rationale. First and most fundamentally, the "significant progress" requirement is not in the plan or Travelers' internal guidelines. Second, such a requirement makes no sense. If, as his doctors and therapists believe, intensive therapy is necessary to *prevent harm* (e.g., contractures), then it is medically necessary "treatment" for his cerebral palsy. It is as important not to get worse as to get better. Third, there is no medical evidence in the record from which Travelers could make such a "finding." Both Dr. Swetenburg and Dr. Lesser reported "progress,"

and Dr. Pollack did not even call Ms. Wells. Fourth, the implication that walking by age five would not be "significant progress" for this unfortunate child is simply revolting.

Finally, the precipitous decision to give up on Ethan was made by Dr. Pollack, who could provide scant support for it at deposition. Travelers boldly states that she has "a wealth of experience in pediatrics and knowledge of cerebral palsy in children." Brief of Appellee, at 8. We see nothing to support this statement in her deposition. In fact, she was asked whether, in her twenty years of practice (before she went to work for Travelers), she *ever* "prescribe[d] either speech therapy, occupational therapy, or physical therapy for [her] cerebral palsy patients." Her answer:

> *No.* Because in the area where I practiced, the routine was to, and it was set up this way, say it is a closed panel, the routine was to send children with cerebral palsy to the Kennedy Center and the Albert Einstein College of Medicine. And they were cared for there. We took care of only their routine physical care.

So much for Dr. Pollack's "wealth of experience."

It gets worse. Dr. Pollack was asked whether physical therapy would prevent contractures. She said, "No." Why not? "Because it is my belief that it is not an effective way to prevent contractures." Where did this belief come from? "I cannot tell you exactly how I developed it because I haven't thought about it for a long time."

The nadir of this testimony was reached soon thereafter, as the baselessness of Dr. Pollack's decision became apparent:

> Q   ... If Dr. Lesser and Dr. Swetenburg were of the opinion that physical therapy at that rate and occupational therapy at that rate was medically necessary for Ethan Bedrick, would you have any reason to oppose their opinion?
>
> A   I am not sure I understand the question. Using what definition of medical necessity?
>
> Q   Well, using the evaluation of medical necessity as what is in the best interests of the child, the patient?

A I think we are talking about two different things.

Q All right. Expand, explain to me what two different things we are talking about?

A I'm speaking about what is to be covered by our contract.

Q Is what is covered by your contract something that's different than the best interests of the child as far as medical treatment is concerned? [objection omitted]

A I find that's a little like "have you stopped beating your wife?"

Q That's why I ask it. [objection, question is rephrased]: [I]f Dr. Swetenburg and if Dr. Lesser recommend physical therapy and occupational therapy at the rates prescribed, do you have any medical basis for why that is an inappropriate treatment that has been prescribed [for Ethan]? [objection omitted]

A *I have no idea. I have not examined the patient whether it is appropriate or inappropriate. But that isn't a decision I was asked to make.*

The fiduciary of an ERISA plan must act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits . . . and defraying reasonable expenses." 29 U.S.C. § 1104(a)(1)(A). This duty of loyalty to plan participants presents the insurer-employee of an insurer-funded plan with a most difficult task.

> Even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the interests of the plan, leaving beneficiaries less protected than when the trustee acts without self-interest and solely for the benefit of the plan.

*Doe,* 3 F.3d at 86–87.

To put it most charitably, we think it abundantly clear that Dr. Pollack at least "unconsciously" put the financial interest of Travelers above her fiduciary duty to Ethan. Indeed, this employee of Travelers' "Con-

servCo" was not even "asked to make" a judgment about the appropriateness of the prescribed care for Ethan, in whose interests ERISA demands that she solely act.

Moreover, Dr. Robbins' much-delayed review cannot cure the breach of duty. He views himself as a "supporter" of Travelers' "legal department" and "field office." He has not seen patients in seven years, and he admitted that he is not familiar with textbooks or treatises on cerebral palsy. His opinion was based on a single medical journal article, which is uncited here.[3]

■ A fiduciary with a conflict of interest must act as if he is "free" of such a conflict. *Doe,* 3 F.3d at 87. "Free" is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants. Travelers did not evaluate Ethan's physical and occupational therapy claims in a manner consistent with this duty. We reverse the denial of benefits.

### IV.

■ The plan provides coverage for speech therapy, but there is a significant limitation: "These services must be given to restore speech." Ethan has never been able to talk, so the therapy he receives cannot be said to "restore speech." Medically necessary or not, there is just no coverage here. Because our review is de novo and disinterested, Travelers' conflict of interest is not relevant.

### V.

The policy provides coverage for durable *medical equipment that is medically neces-*sary and "which replaces a lost body organ or part or helps an impaired one to work."

Travelers denied the claim for an upright stander as "not medically necessary." The Bedricks challenged this finding, but neither Dr. Pollack nor Dr. Robbins ever reviewed the medical necessity of the stander. At his deposition, Dr. Robbins stated that the *bath*

---

**3.** In addition, Dr. Robbins reported that the conclusion of the article was that intensive physical therapy does not speed the development of children with severe cerebral palsy. Dr. Robbins *disagreed* with Dr. Pollack's personal "belief" that physical therapy does not prevent contractures, though he believed that appropriate therapy could be done at home and without the involvement of a professional therapist.

*chair* was a "convenience item." The district court cited the same deposition for the proposition that Dr. Robbins had deemed the bather *and the stander* as items of convenience. In its brief, Travelers twice repeats the district court's misreading of the record. Brief of Appellee, at 11 and 33.

■ In short, it appears that Travelers never reviewed the medical necessity of the stander, and there is nothing in the record to rebut the opinion of Ethan's physical therapist:

> The upright stander and modifications provide support that allows a child with motor delays—such as Ethan—the opportunity to stand with correct alignment of the hips, knees and ankles. This standing position is important to bone development as well as development of the hip joint. Reports in the professional literature indicate that there is a decrease in contractures and fractures in those disabled children who participate in a standing program. In addition, the upright stander will work to facilitate sustained neck and trunk extension for Ethan. The standing will also provide a symmetrical position for him, as well as the opportunity to develop movements of the shoulders and arms.

On this record,[4] a decision that the stander was not medically necessary would clearly be an abuse of discretion. We must therefore reverse.[5]

We reverse the judgment of the district court as to physical and occupational therapy and the upright stander, and we remand with instructions to grant summary judgment for the plaintiffs. In all other respects, we affirm the judgment.

---

4. In this regard, we must point out a rather egregious misstatement of the record Travelers makes in support of its denial of coverage for the stander (Brief of Appellee, at 33, emphasis added):

> Ethan Bedrick's condition is such that there is only a fifty percent chance he will *ever* walk. (J.A. 165). Therefore, Ethan will remain in a seated position *for most of his life* [and a stander is therefore unnecessary].

The joint appendix page cited actually reveals that Ethan's pediatrician told Dr. Pollack that Ethan had a 50/50 chance of walking by *age 5*. If Ethan is not going to "remain in a seated position for most of his life," the stander be-

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.*

---

comes even more necessary, in order to properly develop his hip joints.

5. We affirm the denial of benefits for the bath chair. Travelers paid for a positioning chair for Ethan, and the Bedricks requested an additional chair to hold him for baths only. Travelers denied the claim as not covered. According to Dr. Robbins, the bath chair was for the convenience of Ethan's parents, rather than to "replace[ ] a lost body organ or part or help[ ] an impaired one to work." Though we give no deference to Dr. Robbins and review this interpretation de novo, we see no error.