John DOE; Firm Doe, Plaintiffs–
Appellants,

v.

GROUP HOSPITALIZATION & MEDI-
CAL SERVICES, d/b/a Blue Cross and
Blue Shield of the National Capital
Area, Defendant–Appellee.

No. 92–2525.

United States Court of Appeals,
Fourth Circuit.

Argued April 1, 1993.

Decided Aug. 18, 1993.

Kirk R. Ruthenberg, Sonnenschein, Nath & Rosenthal, Washington, DC, argued (Duane C. Quaini, Amy L. Bess, Sonnenschein, Nath & Rosenthal, Washington, DC, on the brief), for plaintiffs-appellants.

Charles Joseph Steele, Foley & Lardner, Washington, DC, argued (Mary Atchley Jester, Foley & Lardner, Washington, DC, on the brief), for defendant and appellee.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and HALL and NIEMEYER, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

John Doe, a 59–year–old law partner of Firm Doe in Washington, D.C., was diagnosed in late 1991 with multiple myeloma, a rare and typically fatal form of blood cancer. His physician, Dr. Kenneth C. Anderson of the Dana–Farber Cancer Institute, affiliated with Harvard Medical School, prescribed a treatment that involved an initial course of chemotherapy to reduce the percentage of tumor cells. Provided Doe responded to the therapy and achieved a "minimal disease status," Dr. Anderson recommended that Doe then undergo high-dose chemotherapy and radiation therapy combined with an autologous bone marrow transplant. The bone marrow transplant procedure, prescribed to replace bone marrow damaged by the treatment, consists of "harvesting" some of the patient's bone marrow, freezing it for preservation, and, after the chemotherapy, reinfusing it for regeneration. The cost of the entire treatment was estimated at $100,000. Dr. Anderson stated that the prescribed treatment "offers this gentleman his only chance of long-term survival."

John Doe and Firm Doe sought health insurance benefits for the prescribed treatment from Group Hospitalization and Medical Services, Inc., doing business as Blue Cross and Blue Shield of the National Capital Area (Blue Cross). Blue Cross insured and administered Firm Doe's employee welfare benefit plan pursuant to a group insurance contract entered into effective January 1, 1989. Relying on language in the contract that excludes benefits for bone marrow transplants undergone in treating multiple myeloma, as well as for "related" services and supplies, Blue Cross denied benefits. John Doe and Firm Doe promptly filed suit against Blue Cross under § 502 of the Employee Retirement Insurance Security Act (ERISA), 29 U.S.C. § 1132, claiming that Blue Cross denied benefits based solely upon improperly adopted amendments to the group insurance contract and that, in any event, the contract's language as amended did not exclude coverage for the treatment. On cross-motions for summary judgment, the district court entered judgment for Blue Cross, holding that "Blue Cross may properly deny coverage to John Doe and his physicians based on the Group Contract and amendments thereto." This appeal followed.

Reviewing the plan administrator's discretionary decision to deny coverage under a less deferential standard than would typically be applied because of the administrator's conflict of interest, we reverse the portion of the decision denying benefits for chemotherapy and radiation therapy and affirm the remainder.

I

The group insurance contract to which we must look to resolve the issues in this case was purportedly amended by a letter sent to Firm Doe dated November 30, 1990. The amendment is important because it supplied the language on which Blue Cross relied to deny coverage and gave Blue Cross discretion in deciding eligibility and contract interpretation issues.

John Doe and Firm Doe contend that Blue Cross failed to comply with the terms of the group insurance contract and the provisions of ERISA when attempting to amend the contract with the November 30, 1990, letter. Failing validity of the amendment, they ar-

gue, there is no language on which Blue Cross could have relied to deny benefits for John Doe in connection with the prescribed treatment of his cancer.

In December 1991 John Doe was evaluated and diagnosed with multiple myeloma, having entered the hospital in November for acute back pain radiating down his legs. By letter dated January 30, 1992, John Doe's physician, Dr. Anderson, prescribed a treatment of chemotherapy and radiation that included an autologous bone marrow transplant. On March 30, 1992, Dr. Gregory K. Morris, vice president and medical director of Blue Cross, wrote Dr. Anderson denying the request for coverage of the proposed treatment. Specifically referring to the language of the November 30, 1990, amendment that excludes from coverage treatment of myeloma by means of bone marrow transplant and services and supplies related thereto, Dr. Morris stated that Blue Cross will be "unable to provide benefits for Mr. [Doe]." Relying on the same language Blue Cross also, at a later date, denied coverage for blood tests prescribed in the subsequent months by Doe's doctor, stating that "they [too] are related to non[-]covered bone marrow transplant." John Doe's appeal for reconsideration of Blue Cross' position was denied by Blue Cross, and Doe and Firm Doe thereafter filed this suit.*

The November 30 letter was a form letter apparently sent to all administrators of Blue Cross group insurance contracts. It opens by stating that its purpose is to "inform you of updates" to the group contract. It then addresses changes to no less than eight separate aspects of coverage in four single-spaced pages, including one headed "Organ Transplants" that includes the language in question. The letter concludes:

The changes described in this Letter of Amendment will not result in a change in your group rates at this time. Please attach this Letter of Amendment to your copy of the Group Contract(s).

A Subscriber Bulletin is enclosed for your Employees which summarizes these changes. You may duplicate this bulletin as needed, or request additional copies by contacting the marketing service representative for your group. If you have any questions about these changes, please contact your service representative.

John Doe and Firm Doe contend that the amendment was ineffective for two reasons: It was not adopted in accordance with the contract's specified time periods for making amendments, and, even if it was timely, the language of the amendment misled the contract holder, Firm Doe, and its employees about the nature of the changes.

■ We address first John Doe and Firm Doe's argument that the amendment was untimely. The original contract, effective January 1, 1989, provided that amendments could be made after the *initial* contract year provided Blue Cross gave the contract holder "at least 60 days written notice prior to such change." In August 1989, eight months after the commencement of the contract and therefore during its initial year, Blue Cross changed the notice requirement from 60 days to 30 days. Since that amendment could not take effect during the initial contract year, we agree with the district court's ruling that it took effect January 1, 1990, and therefore applied to the November 30, 1990, amendment issued 11 months later.

While the November 30 amendment did not provide for an effective date, by reason of the contract language requiring 30 days notice before an amendment could be made, the

* After denying coverage and rejecting John Doe's appeal, Blue Cross amended the group insurance contract on May 28, 1992, effective August 1, 1992, to confirm its interpretation of the contract and to exclude the treatment for which John Doe had requested precertification. Because ERISA requires that specific reasons for denial of a claim be given, *see* 29 U.S.C. § 1133, our review in this case is limited to only those reasons which Blue Cross gave for denying coverage. *See Weaver v. Phoenix Home Life Mutual Ins. Co.*, 990 F.2d 154, 158 (4th Cir.1993); *see also Makar v. Health Care Corp.*, 872 F.2d 80, 83 (4th Cir.1989) (discussing the importance of the ERISA internal review scheme). However, any attempt by Blue Cross to rely on a post-precertification pre-therapy amendment to deny benefits to John Doe, which would be inappropriate to anticipate now, might raise serious questions concerning Blue Cross' duties, both as a fiduciary and under the insurance contract with Firm Doe, and its good faith.

November 30 amendment became effective 30 days later, by January 1, 1991, and was therefore effective on March 10, 1992, when Blue Cross relied on it to deny benefits.

John Doe and Firm Doe maintain that the August 1989 amendment, changing the notice period from 60 days to 30, was ineffective. Therefore, they contend, the November 30, 1990, amendment could not go into effect on January 1, 1991, because all changes had to become effective on the anniversary date of the contract, and 60 days would have put the effective date after the anniversary date. We find no contract language to support this argument; indeed the contract provides for amendment *"on or after* the *first* anniversary"* upon proper notice. Furthermore, even if we accept the argument, the effect at best for John Doe would be a delay of the amendment until the next anniversary date, January 1, 1992, still before the action of Blue Cross taken on March 10, 1992.

■ In connection with their second point, John Doe and Firm Doe argue that while the language contained in the section headed "Organ Transplants" purports to "clarify" the types of transplants covered ("In order to *clarify* which types of transplants are covered, a list of the covered procedures [is] being added to your Contract as follows" (emphasis added)), coverage was in fact narrowed by the amendment because before the amendment transplants were simply not addressed and were therefore presumptively covered so long as they were not excluded under some other provision. They argue, therefore, that Blue Cross failed to disclose the intended effect of the limitation for organ transplants, downplaying the significance of the letter. Doe and Firm Doe maintain that this conclusion is corroborated by the fact that no effective date for the letter amendment was provided, arguing that an amendment would properly give an effective date. In short, they maintain that Blue Cross failed to put Firm Doe on notice of an amendment. From our review of the letter and the parties' conduct in response to it, we find this argument unpersuasive.

■ Health care benefits provided in an employee benefit plan are not vested benefits; the employer may modify or withdraw these benefits at any time, provided the changes are made in compliance with ERISA and the terms of the plan. *See* 29 U.S.C. § 1051 (ERISA vesting provisions do not apply to employee welfare benefit plans); *Sejman v. Warner–Lambert Co.,* 889 F.2d 1346, 1349 (4th Cir.1989), *cert. denied,* 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990). Firm Doe established its benefit plan through a contract with Blue Cross, and as part of this contract, Firm Doe accepted the provision that "benefits, provisions, terms, or conditions" could be changed by Blue Cross upon timely written notice. We believe that the November 30 letter provided sufficient notice that benefits under the contract were being changed. It states at the outset that the letter is an "update" of the terms of the contract. The body of the letter refers to specific coverages, outlining the changes in the language for each. The letter concludes that this "Letter of Amendment" will not change group rates and requests that the contract holder attach it to the group contract. A "Subscriber Bulletin" was also enclosed for distribution to employees to "summarize[ ] these changes." Finally, the firm administrator was invited to ask questions about the "changes."

Evidence was also presented that Firm Doe in fact relied on the changes made by the November 30 letter in connection with other coverages and it continued to pay premiums under the contract without objection. Moreover, the amendment was circulated well before John Doe evidenced any symptoms of or was diagnosed with cancer. More than 15 months after the amendment was sent, Blue Cross relied on its language in reviewing the coverage, and we believe that it was correct in doing so.

## II

John Doe and Firm Doe contend that even the amended language of their group insurance contract with Blue Cross does not provide a basis for the insurance company's decision to deny John Doe benefits. Before turning to the validly amended contract to review this decision, we must address the appropriate standard of review to apply.

■ Court actions challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B) are subject to the standard of review announced in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Court observed there, deriving guidance from principles of trust law, that in reviewing actions of a fiduciary who has been given discretionary powers to determine eligibility for benefits and to construe the language of an ERISA plan deference must be shown, and the fiduciary's actions will be reviewed only for abuse. *Id.* at 111, 109 S.Ct. at 954. If discretionary authority is not provided, denials of claims are to be reviewed *de novo. Id.* at 115, 109 S.Ct. at 956; *see also De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187 (4th Cir.1989) (considering when a plan confers discretion). Thus, where a fiduciary with authorized discretion construes a disputed or doubtful term, we will not disturb the interpretation if it is reasonable, even if we come to a different conclusion independently. *See Firestone,* 489 U.S. at 115, 109 S.Ct. at 956; *Holland v. Burlington Indus. Inc.*, 772 F.2d 1140, 1149 (4th Cir.1985) (the courts may not replace a reasonable interpretation by a trustee with discretion with an interpretation of their own), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562, *and aff'd mem. sub nom. Brooks v. Burlington Industries,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986). In *Firestone,* however, the Supreme Court went on to recognize that a conflict of interest could lower the level of deference to be applied to a discretionary decision by a fiduciary:

> Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion."

489 U.S. at 115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts § 187 comment d (1959)).

■ Under the group insurance contract with Firm Doe, the employer, Blue Cross both insures and administers the payment of health care benefits for Firm Doe's employee welfare benefit plan. In its role as plan administrator, Blue Cross clearly exercises discretionary authority or discretionary control with respect to the management of the plan and therefore qualifies as a fiduciary under ERISA. 29 U.S.C. § 1002(21)(A). Only if Blue Cross has also been given discretionary authority with regard to decisions about eligibility for benefits and construction of the plan, however, will those decisions be entitled to deferential review. *See Firestone,* 489 U.S. at 115, 109 S.Ct. at 956; *see also Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 60–61 (4th Cir.1992) (status as a fiduciary is not an indivisible concept and only specifically assigned discretionary duties are entitled to discretionary review), *cert. denied,* — U.S. —, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993).

■ Blue Cross asserts that it has been given discretionary authority to review claims, determine eligibility, and construe contract terms and that our review of its decision to deny Doe benefits is therefore only for abuse of discretion. We agree that the express terms of the group insurance contract give Blue Cross discretion to the extent it claims. The terms were stated in the November 30, 1990, letter of amendment as follows:

> [Blue Cross] shall have the full power and discretionary authority to control and manage the operation and administration of the Contract, subject only to the Participant's rights of review and appeal under the Contract. [Blue Cross] shall have all powers necessary to accomplish these purposes in accordance with the terms of the contract including, but not limited to:
>
> a. Determining all questions relating to Employee and Family Member eligibility and coverage;
>
> b. Determining the benefits and amounts payable therefor to any Participant or provider of health care services;
>
> c. Establishing and administering a claims review and appeal process; and
>
> d. Interpreting, applying, and administering the provisions of the Contract.

John Doe and Firm Doe contend, however, that in denying benefits to John Doe, Blue

Cross operated under a conflict of interest, and that therefore no deference to its discretion is warranted. They note that ERISA imposes on fiduciaries a duty of loyalty to act "with respect to a plan *solely* in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits ... and defraying reasonable expenses." 29 U.S.C. § 1104(a)(1)(A) (emphasis added); *see also* Restatement (Second) of Trusts § 170(1). Blue Cross apparently is compensated by a fixed premium, and when it pays a claim it funds the payment from the premiums collected. No evidence has been presented to suggest it has a mechanism to collect from the employer retrospectively for unexpected liabilities. It therefore bears the financial risk for claims made beyond the actuarial norm. John Doe and Firm Doe point out that "each time [Blue Cross] approves a payment of benefits, the money comes out of its own pocket" and argue that Blue Cross' fiduciary role as decisionmaker in approving benefits under the plan therefore "lies in perpetual conflict with its profit-making role as a business." *See Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1561 (11th Cir.1990), *cert denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *cf. De Nobel*, 885 F.2d at 1191 (finding that a conflict of interest does not necessarily exist merely because a decision saved a fully-funded plan money). They urge that, because of this conflict, when we review Blue Cross' decision to deny Doe benefits, no deference to its judgment is due. Indeed, they direct us to the statement in *Brown* where the court concluded that when a substantial conflict of interest is demonstrated, "the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest." 898 F.2d at 1566.

We were first presented with the question of what effect a fiduciary's conflict of interest might have in *De Nobel*. There, the employee-claimants, who were beneficiaries of an employee retirement plan, contended that decisions of the administrators of the plan were not entitled to deferential review because the administrators operated under a conflict of interest arising from their dual role as plan administrators and employees of the sponsor-

ing company. The beneficiaries argued that decisions by the administrator favorable to the employer would save the plan "substantial sums." 885 F.2d at 1191. In deciding the case, however, we never reached the effect that a conflict of interest might have on the applicable standard of review because we concluded that no substantial conflict existed when the plan was fully funded and any savings would inure to the direct benefit of the *plan*, and therefore to the benefit of *all* beneficiaries and participants. Accordingly, we rejected the claim that employees of the plan's sponsor who also served as the plan's administrators are by the fact of their employment alone "presumptive[ly] bias[ed]." *Id.*

In this case, Blue Cross insured the plan in exchange for the payment of a fixed premium, presumably based on actuarial data. Undoubtedly, its profit from the insurance contract depends on whether the claims allowed exceed the assumed risks. To the extent that Blue Cross has discretion to avoid paying claims, it thereby promotes the potential for its own profit. That type of conflict flows inherently from the nature of the relationship entered into by the parties and is common where employers contract with insurance companies to provide and administer health care benefits to employees through group insurance contracts. Not only is this type of arrangement well understood, in this case it was the relationship deliberately subscribed to when Firm Doe entered into the group insurance contract. Under the arrangement, Firm Doe, which is not a large firm, delegated certain fiduciary responsibilities and relieved itself of the financial burdens of self-funding its plan.

■ Under the common law a fiduciary may be authorized to act despite a conflict of interest by the terms of the trust instrument. *See* Restatement (Second) of Trusts § 170(1) comment a. But this consent does not mean that the fiduciary's judgment will not be scrutinized more closely than when he acts solely in the interest of the beneficiaries. Even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the interests of the plan, leaving beneficiaries less protected

than when the trustee acts without self-interest and solely for the benefit of the plan. As noted in *Firestone,* these same principles apply in the ERISA context, and a conflict of interest environment is thus a factor to be considered in determining whether authorized discretion has been abused. 489 U.S. at 115, 109 S.Ct. at 957.

Because of the presence of a substantial conflict of interest, we therefore must alter our standard of review. We hold that when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict. *See* Restatement (Second) of Trusts § 187 comment d; *cf. Brown,* 898 F.2d at 1566 (shifting the burden of showing that an interpretation was not tainted by self-interest to the fiduciary once a substantial conflict of interest is shown). With that lessened degree of deference to Blue Cross' discretionary interpretation of the group insurance contract, we turn to review Blue Cross' decision to deny benefits.

### III

In considering the question of whether the procedures for which coverage was claimed are covered by the Blue Cross contract as amended, we must first consider the nature of the treatment for which benefits are sought.

Multiple myeloma is a cancer of the blood that, although typically fatal, can be treated in different ways with varying degrees of success, all involving chemotherapy and sometimes radiation therapy. The treatment prescribed by Dr. Kenneth Anderson was explained in more detail by Dr. John A. Miller, who was also treating Doe. Dr. Miller explained that standard out-patient levels of chemotherapy provide only limited success in treating multiple myeloma. Complete remission is both "rare and short-lived." On the other hand, high-dose chemotherapy has, according to him, achieved a high rate of success. A limitation upon the high-dose treatment, however, is imposed by the side effects that the chemotherapy has on the bone marrow. As the dosage increases, the toxic effect on the bone marrow increases, damaging and ultimately destroying it. To side-step this result, bone marrow is removed from the patient before the chemotherapy is begun, is frozen for preservation, and is later reinfused after treatment by what Dr. Miller characterized as "a simple transfusion." Indeed, Dr. Miller stated that the entire treatment involves no new technologies. Because the bone marrow reinfused in the patient is his own, the transplant is called "autologous." It appears to be undisputed that the autologous bone marrow transplant has been incorporated into a treatment using high-dose chemotherapy solely to protect the bone marrow from damage caused by the treatment. The transplant itself apparently provides no treatment for the cancer. Rather, the cancer is treated by the high doses of chemicals introduced into the blood stream to kill the tumors. Radiation has also been prescribed for killing the cancerous tumors.

Both chemotherapy and radiation are treatments for which the Blue Cross contract provides coverage. The basic benefits that are provided for hospital services, as stated in Part 3 of the contract, include payment for:

clinical laboratory services; *radiation therapy (x-ray, radium and radon) for the treatment of malignancies* and benign neoplasms; diagnostic radiological services; diagnostic ultrasound services; radioisotope services; electrocardiograms; electroencephalograms; electroshock therapy; tonograms; *chemotherapy for treatment of a malignant condition* by use of chemotherapeutic or antineoplastic agents; and administration of general anesthetics in connection with a Surgical Service or Obstetrical Service for which benefits are granted

to the Participants under Article IV hereof.

(emphasis added). Without consideration of a potential bone marrow transplant, treatment of blood cancer by chemotherapy and radiation is accordingly clearly covered by the contract.

■ By the November 30 amendment, however, the autologous bone marrow transplant procedure for multiple myeloma was explicitly excluded from coverage. That amendment provides, in relevant part:

> *Organ Transplants*—In order to clarify which types of transplants are covered, a list of the covered procedures [is] being added to your Contract as follows: Services or supplies for or related to transplant procedures, including human organ transplants, are not covered, except for the following procedures:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Autologous bone marrow for:
> – Non–Hodgkin's lymphoma, Stage III A or B, or Stage IV A or B;
> – Hodgkin's Lymphoma Stage III A or B, or Stage IV A or B;
> – Neuroblastoma, Stage III or Stage IV;
> – Acute lymphocytic leukemia following first or second relapse;
> – Acute non-lymphocytic leukemia following first or second relapse[.]

Thus, the contract as amended November 30, 1990, provides that an autologous bone marrow transplant for multiple myeloma and "services or supplies for or related to" the transplant are excluded from the plan's coverage.

■ Blue Cross argues that the language excluding "services or supplies for or related to" the autologous bone marrow transplant reaches to exclude high-dose chemotherapy and radiation treatments because without the autologous bone marrow transplant, the high-dose chemotherapy could not be performed. It also relies on the affidavit of Dr. Ronald B. Herberman who stated: "I am personally familiar with the use of high-dose chemotherapy and autologous (or allogeneic) bone marrow transplant ('HDCT–ABMT') in the treatment of cancer. In such treatment, the administration of high-dose chemotherapy is related and connected with ABMT." While Dr. Herberman confirms a nexus between high-dose chemotherapy and the bone marrow transplant, he does not state which procedure is the supportive one. Blue Cross argues that that question is irrelevant and urges an interpretation that would exclude any service or supply which is in any way related to an excluded procedure, whether or not the service or supply is explicitly covered elsewhere. We believe that such an argument misdirects the analysis required for determining the scope of coverage and fails to accommodate harmoniously all provisions of the contract.

The bone marrow transplant, while necessary to avoid a disastrous side effect, is not the procedure designed to treat the cancer. The first question to be asked, therefore, is whether the cancer treating procedure is covered by the contract, and, as already noted, we have found it is. While Blue Cross is well within its rights to exclude from coverage the ancillary bone marrow transplant procedure, the exclusion should not, in the absence of clear language, be construed to withdraw coverage explicitly granted elsewhere in the contract.

To illustrate, if the contract provided, hypothetically, that no dental work of any kind was covered but that radiation treatments for cancer were, would the fact that rehabilitation of the teeth was required as a result of radiation treatments provide the basis to interpret the dental exclusion to deny coverage for radiation treatments simply because they are related? We think not. In the context of the various coverages, we construe "related" to mean those procedures and treatments that support and are directly related to the excluded procedure when not explicitly covered elsewhere. *See also Wilson v. Group Hospitalization and Medical Services, Inc.,* 791 F.Supp. 309, 313 (D.D.C.1992) (construing the same language and concluding that "related to" cannot be interpreted so broadly as to exclude every facet of treatment).

We additionally note that in determining whether a decision has been made solely for

the benefit of the participants, we may take account of the principle that in making a reasonable decision, ambiguity which remains in the scope of the "related to" language must be construed against the drafting party, particularly when, as here, the contract is a form provided by the insurer rather than one negotiated between the parties. *See Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539 (9th Cir.) (using a presumption such as construction against the drafter in evaluating the reasonableness of an interpretation is not inconsistent with review for abuse of discretion), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990); *see also Glocker v. W.R. Grace & Co.,* 974 F.2d 540, 544 (4th Cir.1992) (when exercising *de novo* review, the court must apply such traditional rules of contract interpretation as the construction of ambiguity against the drafter); *Phillips v. Lincoln Nat'l Life Ins. Co.,* 978 F.2d 302, 314 (7th Cir.1992) (when the parties did not negotiate the terms of the contract, the court construed all ambiguities against the drafter in conducting *de novo* review); *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.,* 936 F.2d 98, 107 (2d Cir.1991) (construing ambiguities in insurance contracts subject to *de novo* review against the drafter).

Because Blue Cross' discretionary interpretation to the contrary is not entitled to the deference we might otherwise accord, for the reasons given in Part II, above, we will construe the contract for the benefit of its beneficiaries and enforce the coverage provided by Part 3 of the group insurance contract and not otherwise explicitly excluded.

## IV

To summarize, we hold that Blue Cross properly amended the group insurance contract with its November 30, 1990, letter of amendment and that it properly took that amendment into account when deciding on March 10, 1992, whether to deny benefits to John Doe. We also agree that the contract, as amended, does not cover benefits for autologous bone marrow transplants for multiple myeloma. But in construing the added language to exclude benefits for chemotherapy and radiation therapy for the treatment of cancer by interpreting those treatments as "services or supplies for or related to" the transplant, we conclude Blue Cross abused its discretion, particularly when we factor into our review the less deferential standard applied by reason of Blue Cross' financial interest in the outcome of its decision. The exclusion for "services or supplies for or related to" the bone marrow transplant refers to all procedures and treatments to support the transplant but does not reach back to eviscerate the underlying coverage for chemotherapy and radiation treatments of cancer provided in Part 3 of the contract. We therefore affirm in part, reverse in part, and remand the case for further proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.