**BOARD OF TRUSTEES OF the UNIVERSITY OF ARKANSAS,**
Plaintiff,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Tommy G. Thompson, Defendant.**

No. 4:04CV00032 JLH.

United States District Court,
E.D. Arkansas,
Western Division.

Feb. 1, 2005.

Robert W. Bishop, University of Arkansas Office of General Counsel, Little Rock, AR, for Plaintiff.

Richard M. Pence, Jr., U.S. Attorney's Office, Little Rock, AR, for Defendant.

## OPINION AND ORDER

HOLMES, District Judge.

The Board of Trustees of the University of Arkansas seeks review of a final decision of the Departmental Appeals Board Medicare Appeals Council of the U.S. Department of Health and Human Services ("Appeals Board") under 42 U.S.C. § 405(g) and § 1395ff. The Secretary of Health and Human Services, Tommy G. Thompson ("Secretary"), denied the University of Arkansas Medical Center's ("UAMS") Medicare claims for treatment provided to 12 patients diagnosed with multiple myeloma. UAMS seeks payment in the total amount of $502,258.58 for high dose chemotherapy and autologous stem cell transplant, or, in the alternative, in the total amount of $132,900.32 for high dose chemotherapy for these 12 patients.

### I.

Multiple myeloma represents nearly 1% of all cancers and nearly 10% of hematological malignancies. It is a rapidly progressive disease with a median survival (without treatment) of less than one year.

The standard treatment for multiple myeloma at UAMS is to administer high dose chemotherapy followed by an autologous stem cell transplantation. First, stem cells are extracted from the patient's body and temporarily placed in storage. Then, the patient is given a near-lethal cycle of high dose chemotherapy to treat the multiple myeloma. Thereafter, the stem cells are restored to the patient's bloodstream to relieve the patient from the toxic effects of the chemotherapy.

The Health Care Finance and Administration contracts with private insurance companies which, together with local peer review organizations, process claims for Medicare beneficiaries. *Bd. of Regents of the Univ. of Minn. v. Shalala,* 53 F.3d 940, 941 (8th Cir.1995). A Medicare claim submitted for payment is approved or denied in the first instance by the Medicare intermediary. Here, the intermediary is Arkansas Blue Cross/Blue Shield ("the Intermediary").

Prior to 1999, the Intermediary paid for high dose chemotherapy for treatment of multiple myeloma but not for stem cell transplants. On January 27, 1999, the Intermediary wrote a letter to UAMS stating, in pertinent part:

> Stem cell transplantation and high-dose chemotherapy for multiple myeloma are non-covered by the Medicare program. The admission for a Medicare beneficiary receiving high dose chemotherapy followed by stem cell transplant would be non-covered for the entire admission, unless a condition developed that was totally unrelated to the high dose chemotherapy and transplantation.

No change in policy by the Secretary precipitated this letter.

Later in 1999, UAMS provided high dose chemotherapy and autologous stem cell transplantation to the 12 patients whose treatment is at issue here and sought payment for this treatment the Intermediary. The Intermediary denied coverage for the entirety of these admissions. UAMS appealed. The ALJ conducted an evidentiary hearing on July 31, 2001, and upheld the Intermediary's decision denying benefits in an opinion dated January 25, 2002. UAMS again appealed. The Appeals Board denied UAMS's request for review of the decision on November 14, 2003.

### II.

Dr. Barthel Barlogie, Director of the Myeloma Institute at UAMS, had direct involvement in the care, supervised the care, or reviewed the care for each of the

patients whose treatment is at issue in this appeal. His testimony was presented to the ALJ through his affidavit. His affidavit states:

Each of these patients received treatment for multiple myeloma. Each received high dose chemotherapy during the inpatient treatment dates [covered in the claims on appeal]. High dose chemotherapy was medically necessary for each of these patients, in particular, high dose chemotherapy offered each of these patients the best opportunity for long term disease free survival.

High dose chemotherapy has a toxic effect on a patient's bone marrow and can be lethal to the patient. To avoid the toxicity to the patient when high doses of chemotherapy are administered the patient's stem cells are removed from the patient and stored. After the patient receives high doses of chemotherapy the patient's stem cells are reintroduced, or transplanted into the patient. The stem cell transplant is not designed to provide treatment of the patient's cancer. High dose chemotherapy is the treatment for the patient's cancer. The high dose of chemotherapy causes the patient's white blood cell count to drop extremely low as the bone marrow is being destroyed. The patient is hospitalized primarily to prevent infection as a result of the effect of the high dose chemotherapy on the patient's body. Hospitalization is not caused by, nor a result of the stem cell transplant. The removal of the patient's stem cells and reinfusion is a very simple procedure somewhat similar to a blood transfusion. The stem cell transplant itself would not cause the patient to be hospitalized and the removal and reinsertion of patient's stem cells can be and is often accomplished in an outpatient setting.

Stated most simply, the stem cell or bone marrow transplant is not designed to treat the cancer. The stem cell or bone marrow transplant is used to address of (sic) the effects of the high dose chemotherapy on the patient's body.

The treatment for each of the patients ... was medically necessary and in the best interest of the patient.

No witness contradicted any portion of Dr. Barlogie's affidavit.

To be covered by Medicare, a medical procedure must be "reasonable and necessary."[1] The Secretary adopts national coverage determinations excluding from coverage certain items and services that are not "reasonable and necessary" under the agency's Medicare statutory interpretations. See 42 U.S.C. § 1395ff(f)(1)(B). The Medicare Coverage Issues Manual is a compilation of national coverage determinations that instruct intermediaries on how to conduct review of Medicare claims submitted by Medicare providers and suppliers for payment. Effective from May 24, 1996, the Secretary determined that stem cell transplantations, both allogeneic and autologous, were not "reasonable and necessary" for treating multiple myeloma. That national coverage determination became the Medicare Coverage Issues Manual § 35–30.1, and provided, in pertinent part:

35–30.1 STEM CELL TRANSPLANTATION

Stem cell transplantation is a process in which stem cells are harvested from ei-

---

**1.** Section 1395y(a)(1)(A) of the Social Security Act, provides in part:
(a) Notwithstanding any other provision of this subchapter, no payment may be under Part A ... for any expenses incurred for items or services—

(1)(A) which, ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,....

ther a patient's or donor's bone marrow or peripheral blood for intravenous infusion. The transplant can be used to effect hematopoietic reconstitution following severely myeloctoxic doses of chemotherapy (HDCT) and/or radiotherapy used to treat various malignancies. Allogeneic stem cell transplant may also be used to restore function in recipients having an inherited or acquired deficiency or defect.

. . .

B. Autologous Stem Cell Transplantation (Effective for Services Performed on or After 04/28/89).—Autologous stem cell transplantation (ICD–9–CM procedure code 41.01 or 41.04) is a technique for restoring stem cells using the patient's own previously stored cells.

 1. Covered Conditions—Autologous stem cell transplantation . . . is considered reasonable and necessary under . . . the Act for the following conditions and is covered under Medicare for patients with:

- Acute leukemia in remission . . . who have a high probability of relapse and who have a high probability of relapse and who have no human leucocyte antigens (HLA)-matched;
- Resistant non-Hodgkin's lymphomas . . . or those presenting with poor prognostic features following an initial response;
- Recurrent or refractory neuroblastoma . . .; or
- Advanced Hodgkin's disease . . . who have failed conventional therapy and have no HLA-matched donor.

 2. Noncovered Conditions—Insufficient data exist to establish definite conclusions regarding the efficacy of autologous stem cell transplantation for the following conditions:

. . .

- Effective May 24, 1996, multiple myeloma (ICD–9–CM code 203.0 and 238.6).

In these cases, autologous stem cell transplantation is not considered reasonable and necessary within the meaning of § 1862(a)(1)(A) of the Act and is not covered under Medicare.

In May 2000, this section of the Medicare Coverage Issues Manual was revised to reflect a changed national coverage determination. The revised § 35–30.1 provides:

35–30.1 STEM CELL TRANSPLANTATION

. . .

B. *Autologous Stem Cell Transplantation (Effective for Services Performed on or After 04/28/89).*—Autologous stem cell transplantation (ICD–9–CM procedure codes 41.01, 41.04, 41.07, and 41.09) is a technique for restoring stem cells using the patient's own previously stored cells.

 1. *Covered Conditions.*—Autologous stem cell transplantation . . . is considered reasonable and necessary under § 1862(a)(1)(A) of the Act for the following conditions and is covered under Medicare for patients with:

- Acute leukemia in remission . . . who have a high probability of relapse and who have no human leucocyte antigens (HLA)-matched;
- Resistant non-Hodgkin's lymphomas . . . or those presenting with poor prognostic features following an initial response;
- Recurrent or refractory neuroblastoma . . .; or
- Advanced Hodgkin's disease . . . who have failed conventional ther-

apy and have no HLA-matched donor;

- Effective October 1, 2000, multiple myeloma (ICD–9–CM 203.0 and 238.6) for beneficiaries less than age 78 who have Durie–Salmon stage II or III newly diagnosed or responsive multiple myeloma with adequate cardiac, renal, pulmonary and hepatic functioning. This includes those patients with previously untreated disease, those with at least a partial response to prior chemotherapy (partial response is defined as a 50% decrease either in measurable paraprotein [serum and/or urine] or in bone marrow infiltration, sustained for at least one month), and those in responsive relapse. Multiple rounds of autologous stem cell transplantation (known as tandem transplantation) will, however, remain non-covered.

2. *Noncovered Conditions.*—Insufficient data exist to establish definite conclusions regarding the efficacy of autologous stem cell transplantation for the following conditions:

- Acute leukemia not in remission . . .;
- Chronic granulocytic leukemia . . .;
- Solid tumors (other than neuroblastoma) . . .;
- Up to October 1, 2000, multiple myeloma[.]

Hence, the revised § 35–30.1, which was promulgated in May 2000, provides that multiple myeloma is a covered condition for autologous stem cell transplantation. As noted, the procedures that are the subject of this appeal occurred in 1999. UAMS argues that these 1999 procedures are covered by the revised section.

UAMS argues in the alternative that, under the 1996 national coverage determination, which was still in effect in 1999, coverage should have been provided for the high dose chemotherapy phase of the treatment even though the stem cell transplantation was not covered. UAMS contends that chemotherapy is a covered treatment for multiple myeloma, and that the Medicare Coverage Issues Manual does not regulate the dosage, thus leaving the dosage to the doctor's judgment. Hence, UAMS argues, if the doctor determines that a patient needs high dose chemotherapy for multiple myeloma, that treatment is covered.

The ALJ made the following findings:

1. The beneficiary[2] was admitted to the University Hospital of Arkansas for treatment from May 5, 1999 to May 17, 1999, and again from September 11, 1999 to September 24, 1999 with a diagnosis of multiple myeloma.

2. The main purpose for the admission on both of the above dates was to perform an autologous stem cell transplant and high dose chemotherapy was an integral part of this treatment.

3. The beneficiary's high dose chemotherapy was a continuation of, and related to, the admission for the autologous stem cell transplant.

4. During all times relevant to the claim herein, the Medicare Coverage Issues Manual excluded autologous stem cell transplant from coverage as not reasonable and necessary in cases of multiple myeloma.

5. Because all services rendered to the beneficiary during his hospitalizations were reasonably attributed to the non-covered transplant, all such

2. Herman C. Doans, Jr., one of the patients whose treatment is at issue.

services must be considered noncovered.

6. University Hospital of Arkansas knew or should have reasonably known that all expenses related to the beneficiary's admissions for autologous stem cell transplant would be considered non-covered and its liability for the services rendered may not be waived.

7. The beneficiary did not and could not have reasonably known that the services being provided by University Hospital of Arkansas were noncovered and his liability for such charges should be waived.

### III.

The parties disagree as to the appropriate standard of review. UAMS maintains that the Administrative Procedure Act, 5 U.S.C. § 706, determines the scope of the Court's review. *See St. Bernard's Hosp., Inc. v. Sullivan, M.D.,* 781 F.Supp. 576, 579 (E.D.Ark.1991). Title 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

In contrast, the Secretary asserts that the proper standard is provided in 42 U.S.C. § 405(g). Under this provision, the Court's review is limited to: (1) whether the Secretary applied the proper legal standards; and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole. *Estate of Morris v. Shalala,* 207 F.3d 744, 745 (5th Cir.2000); *Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). In this case, the differences between 5 U.S.C. § 706 and 42 U.S.C. § 405(g) do not affect the outcome.

The Court must give substantial deference to an agency's interpretation of its own regulations. *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), unless the interpretation is plainly erroneous or inconsistent with the regulation. *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). A reviewing court should not reject a reasonable administrative interpretation even if another interpretation may also be reasonable. *Shalala v. St. Paul–Ramsey Med. Ctr.,* 50 F.3d 522, 528 (8th Cir.1995).

## IV.

### A.

■ UAMS first argues that the national coverage determination promulgated in May 2000 as the revised § 35–30.1 covers autologous stem cell transplantation for multiple myeloma when the service was performed after April 28, 1989, and the coverage decision was made after October 1, 2000. Although the national coverage determination at issue is awkwardly worded, reading the document as a whole, the Court is convinced that the revised section provides coverage for autologous stem cell transplantation for acute leukemia, resistant non-Hodgkin's lymphoma, and advanced Hodgkin's disease for services performed after April 28, 1989, but for multiple myeloma for services performed after October 1, 2000. Subsection 2 relates the date of October 1, 2000, to the existence of data to support the efficacy of the service, a consideration that in turn relates to whether the service was reasonable and necessary. Whether the service was reasonable and necessary is a decision that must be made as of the date of the service. Therefore, the Court affirms the portion of the Secretary's decision holding that the May 2000 national coverage determination does not provide coverage for stem cell transplants performed in 1999.

### B.

■ The national coverage determination in effect in 1999 was the May 24, 1996, version of § 35–30.1, which excluded coverage for stem cell transplants but did not mention high dose chemotherapy. The ALJ here applied that national coverage determination. The issue is whether he applied it correctly.

■ The ALJ found that the main purpose for the 12 patients' admission was stem cell transplantation, which was a noncovered procedure, and that the high dose chemotherapy was so "related to" the transplantation that it could not be severed. Based on these findings, the ALJ held that UAMS was not entitled to reimbursement cost of the high dose chemotherapy treatment nor the autologous stem cell transplant. The finding that the main purpose of the admission was to perform autologous stem cell transplants is clearly erroneous. The medical evidence establishes without doubt that the chemotherapy is the treatment for the multiple myeloma, and that the autologous stem cell transplant is performed to counter the adverse effects of the chemotherapy. The main purpose of the admissions was to provide chemotherapy, not to perform stem cell transplantation. Moreover, Dr. Barlogie's testimony that stem cell transplantation does not require hospitalization is uncontradicted in the record.

The ALJ decision in this case contradicts a February 1999 decision by another ALJ holding that Medicare covered high dose chemotherapy but not autologous stem cell transplantation for services rendered at the Abbott–Northwestern Hospital in Minneapolis, Minnesota. In that case, the ALJ held:

> The undersigned finds the section of the national coverage decision set forth in the *Coverage Issues Manual* was improperly interpreted in this case to deny coverage of the entire hospitalization. By its express terms, the national coverage decision excludes from coverage *only* the stem cell transplant itself and not chemotherapy services or other services provided during the hospitalization. Indeed, chemotherapy, including the high dose chemotherapy which was provided to the beneficiary in hospitalization is covered by Medicare.

In so ruling, the ALJ cited *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80 (4th Cir.1993).

In *Doe*, the Fourth Circuit addressed the question of whether the health insurance policy in question covered any or all of the costs associated with high dose chemotherapy treatment for multiple myeloma. *Doe*, 3 F.3d at 87–88. The policy covered "chemotherapy for treatment of a malignant condition," but it excluded coverage for autologous bone marrow transplants for multiple myeloma; and it excluded "services or supplies for or related to" such transplants. *Id.* The Fourth Circuit held that the exclusion of bone marrow transplants for the treatment of multiple myeloma should not mandate an exclusion of the high dose chemotherapy because the chemotherapy was specifically covered by the policy. *Id.* at 88–89. The court held:

> that the contract, as amended, does not cover benefits for autologous bone marrow transplants for multiple myeloma. But in construing the added language to exclude benefits for chemotherapy and radiation therapy for the treatment of cancer by interpreting those treatments as "services or supplies for or related to" the transplant, we conclude Blue Cross abused its discretion, particularly when we factor into our review the less deferential standard applied by reason of Blue Cross' financial interest in the outcome of its decision. The exclusion for "services or supplies for or related to" the bone marrow transplant refers to all procedures and treatments to support the transplant but does not reach back to eviscerate the underlying coverage for chemotherapy and radiation treatments of cancer provided in Part 3 of the contract.

*Id.* at 89. Although *Doe* is an ERISA case, not a Medicare case, the coverage issue in *Doe* is substantially identical to the coverage issue here. The Medicare Coverage Policy Manual specifically excludes coverage of autologous stem cell transplant—a particular phase of the high dose chemotherapy/autologous stem cell transplant treatment. High dose chemotherapy is not excluded.

The conclusion that the autologous stem cell transplant is excluded but the high dose chemotherapy is covered is supported by the Medicare Intermediary Manual § 3101 and by the Secretary's interpretation of the relevant provisions of the Medicare Coverage Issues Manual. The Medicare Intermediary Manual § 3101 instructs the Intermediary on how to determine if a treatment can be severed between covered and non-covered services. Section 3101 provides in part:

### 3101. COVERED INPATIENT HOSPITAL SERVICES.

■ Patients covered under hospital insurance are entitled to have payment made on their behalf for inpatient hospital services. . . .

Beginning with hospital cost reporting periods occurring on or after October 1, 1983, while some hospitals continue to be paid on a reasonable cost basis for inpatient hospital services, most come under a Medicare prospective payment system (PPS). Under PPS, Medicare will pay a fixed amount for a case. That amount is determined by the Diagnosis Related Group (DRG) into which the case falls. This means that a given all or nothing Medicare payment will be made for a case, based on the DRG assigned, *so long as the admission is medically necessary and appropriate.* Furthermore, under PPS, if an appropriately admitted case results in an extraordinarily long stay (i.e., becomes a day outlier) or results in the expenditure of extraordinary resources (i.e., becomes a cost outlier) additional money, known as outlier payment, is added to the regular Medicare prospective payment amount for the particular DRG.

Therefore, in PPS hospitals, coverage restrictions continue but noncovered care can have only *three* effects: (1) lead to denial of an admission; (2) in appropriately admitted cases where a noncovered procedure was performed, result in payment of a different DRG (i.e., one which excludes payment for the noncovered procedure); or (3) in appropriately admitted cases that become day or cost outlier cases, lead to denial of some or all of an outlier payment.... If a patient is appropriately hospitalized but receives ... only noncovered care ... deny the admission. (Note: *Do not deny an admission so long as inpatient hospital care was medically necessary and covered services required for the adequate treatment and/or diagnosis of the patient's illness were provided, even if noncovered care was also rendered. Under PPS, Medicare assumes that it is paying for only the covered care rendered whenever covered services needed to treat and/or diagnose the illness were in fact provided.*) If a noncovered procedure is provided along with covered nonroutine care, a DRG change rather than an admission denial might occur. [Emphasis added.]

In commenting on the 1996 proposed rule at issue here, the Secretary explained:

Effective October 1, 1994, ICD–9–CM procedure code 41.04, Autologous hematopoietic stem cell transplant, was created to capture the transplantation of stem cells obtained from bone marrow or peripheral blood. At that time, we designated the code as non-OR. When we created this code, we received comments requesting that it be designated as an OR procedure and assigned to DRG 481 (Bone Marrow Transplant) based on the resource use associated with the type of transplant. However, as we stated in the September 1, 1994 final rule (59 FR 45340), when a new code is introduced, our longstanding practice is to assign it to the same DRG category as its predecessor code. Because we could not separately identify the stem cell transplant cases from the other cases coded with 99.73 (the code previously used for stem cell transplant) in order to reclassify them and their charges to a new DRG, we were unable to predict the new weights of both the DRGs in which this code currently is classified and the new DRG to which it would be assigned. Therefore, we were prevented from redesignating code 41.04 as an OR procedure or assigning it to a DRG. However, we stated that we would analyze the stem cell cases as soon as the FY 1995 cases were available.

This year, the FY 1995 MedPAR file is available for use in DRG analysis and weight setting for FY 1997. Since the average resource use associated with stem cell transplant is similar to that associated with bone marrow transplant, we proposed to assign procedure code 41.04 to DRG 481 effective with discharges occurring on or after October 1, 1996. In addition, we proposed to designate stem cell transplant as an OR procedure. In the proposed rule, we noted that, as set forth in the Medicare Coverage Issues Manual at section 35–30.1 (see Transmittal No. 84, April 1996), autologous stem cell transplants are not covered when performed for the following conditions:

- Acute leukemia not in remission (diagnosis codes 204.00, 205.00, 206.00, 207.00 and 208.00).

- Chronic granulocytic leukemia (diagnosis codes 205.10 and 205.11).

- Solid tumors (other than neuroblastomas) (diagnosis codes 140.0 through 199.1).

- Multiple myeloma (diagnosis codes 203.00, 203.01, and 238.6).

We received five comments supporting our proposal to assign procedure code 41.04 to DRG 481, and we will include this change in the final DRG classifications. Two other commenters had specific questions concerning the assignment of cases to DRG 481.

Comment: One commenter questioned the DRG assignment of cases in which an autologous hematopoietic stem cell transplant is performed for one of the noncovered conditions such as acute leukemia not in remission or multiple myeloma. The commenter is unsure whether those cases would be assigned to DRG 481 or retain their current DRG assignment.

Response: When a stem cell transplant is performed for a noncovered condition, the case will not be assigned to DRG 481. If the only reason that the patient is admitted to the hospital is to receive the noncovered procedure, then the case receives no Medicare payment because the hospital stay is not covered. *If a patient receives a noncovered stem cell transplant during an otherwise Medicare-covered stay, then the case is assigned to a DRG based on the patient's principal and secondary diagnoses as well as any other covered procedure the patient receives. The stem cell transplant will not be considered in the DRG assignment.*

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1997 Rates, 61 Fed. Reg. 46,168 (Aug. 30, 1996) (to be codified at 42 C.F.R. pt. 412) (emphasis added). Thus, the DRG[3] is based on the patient's principal and secondary diagnoses and any covered procedure the patient receives; the stem cell transplant is not to be considered in the DRG assignment.

Here, the principal diagnosis is multiple myeloma. Dr. Barlogie testified that high dose chemotherapy was medically necessary for the patients at issue. His testimony is uncontradicted. In the absence of testimony to the contrary, and in the absence of a national coverage determination excluding high dose chemotherapy, the only reasonable conclusion on this record is that high dose chemotherapy was reasonable and necessary under 42 U.S.C. § 1395y(a)(1)(A). According to the Secretary's interpretation at the time § 35–30.1 was promulgated in 1996, though the stem cell transplant, itself, was excluded from coverage, it should not have been considered in the coverage decision as to the chemotherapy.

Medicare Intermediary Manual § 3101.14 is not to the contrary. That section provides:

*Services Related to and Required as a Result of Services Which are Not Covered Under Medicare.—*

A. Medical and hospital services are sometimes required to treat a condition that arises as a result of services which are not covered because they are determined to be not reasonable and necessary or because they are exclude from coverage for other reasons. Services "related to" noncovered services . . . including services related to followup care and complications of noncovered services which require treatment *during a hospital stay* in which the noncovered service was performed, are not covered services under Medicare. Services "not related to" noncovered services *are* covered under Medicare. To the extent that you are responsible for making medical coverage decisions in such cases involving

**3.** Diagnosis Related Group. *See* Medicare Coverage Issues Manual § 3101, quoted above.

inpatient stays, follow the procedures established below.

 B. Identify which services are related to noncovered services and which are not. Following are some examples of services "related to" and "not related to" noncovered services while the beneficiary is an inpatient:

 . . .

2. A beneficiary was admitted to the hospital for covered services, but during the course of hospitalization became a candidate for a noncovered transplant or implant and actually received the transplant or implant during that hospital stay. When the original admission was entirely unrelated to the diagnosis that led to a recommendation for a noncovered transplant or implant, the services related to the admitting condition would be covered.

3. A beneficiary was admitted to the hospital for covered services related to a condition which ultimately led to identification of a need for a transplant and receipt of a transplant during the same hospital stay. If, on the basis of the nature of the services and a comparison of the date they are received with the date on which the beneficiary is identified as a transplant candidate, the services could reasonably be attributed to preparation for the noncovered transplant, the services would be "related to" noncovered services and would also be noncovered.

This section would exclude coverage for the high dose chemotherapy if the patient had been admitted to the hospital for a stem cell transplant, which was a noncovered treatment, and the high dose chemotherapy had been necessitated by the noncovered treatment. However, the medical evidence establishes beyond doubt that the patients in this case were hospitalized for high dose chemotherapy and that the high dose chemotherapy necessitated the stem cell transplant, not vice-versa.

 The finding by the ALJ that the main purpose of the admissions at issue was for stem cell transplantation is clearly erroneous. The ALJ's interpretation of the version of § 35–30.1 in effect in 1999 is clearly erroneous. The decision of the ALJ in this case conflicts with the Secretary's commentary on the national coverage determination of May 1996 that was memorialized as Medicare Coverage Issues Manual § 35–30.1; it conflicts with the Medicare Intermediary Manual § 3101; it conflicts with another ALJ's decision in the Abbott–Northwestern Hospital case; and it conflicts with the Fourth Circuit's decision in *Doe.*

 The ALJ in this case stated that the Eighth Circuit had declined to accept the Fourth Circuit's reasoning in *Doe,* citing *Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263, 1265 (8th Cir.1997), and *Buttram v. Central States,* 76 F.3d 896, 900 (8th Cir. 1996). In *Armstrong,* the Eighth Circuit held that, where the insurer of a health benefits plan is also the plan administrator, the review of a decision to deny benefits must be de novo. *Armstrong,* 128 F.3d at 1265. In so holding, the Eighth Circuit refused to follow the "sliding scale" standard of review approved by *Doe. Id.* *Buttram* cited *Doe's* "sliding scale" approach but declined either to adopt it or reject it. *Buttram,* 76 F.3d at 900 n. 6. Neither case addressed any issue related to high dose chemotherapy/autologous stem cell transplantation. Contrary to the ALJ's opinion, the Eighth Circuit has not rejected any portion of the *Doe* opinion that is relevant to this case.

 The ALJ is reversed on this issue. While the stem cell transplantation was excluded from coverage, the high dose chemotherapy was covered. The holding to the contrary was an abuse of discretion

under 5 U.S.C. § 706(2)(A), and it was unsupported by substantial evidence under 42 U.S.C. § 405(g).

Judgment will be entered in favor of UAMS in the total amount of $132,900.32 for the following claims:

| Name | Date of Service | DRG | DRG Reimbursement |
|---|---|---|---|
| Baldridge | 4/20/99–5/24/99 | 403 | $9,478.14 |
| Copeland | 7/12/99–7/28/99 | 403 | $9,478.14 |
| | 11/29/99–12/15/99 | 403 | $9,648.57 |
| Downs | 5/5/99–5/17/99 | 403 | $9,478.14 |
| | 9/11/99–9/24/99 | 403 | $9,478.14 |
| Green | 7/19/99–8/18/99 | 403 | $9,478.14 |
| Griffith | 3/22/99–4/27/99 | 403 | $9,478.14 |
| Jenkins | 10/13/99–12/1/99 | 403 | $9,648.57 |
| Johnson | 3/4/99–3/18/99 | 403 | $9,478.14 |
| Mitchell | 6/2/99–6/18/99 | 404 | $4,671.82 |
| Palmer | 5/19/99–7/24/99 | 403 | $9,478.14 |
| Thompson | 6/15/99–6/30/99 | 404 | $4,671.82 |
| Vernon | 2/8/99–2/25/99 | 403 | $9,478.14 |
| | 8/18/99–9/18/99 | 403 | $9,478.14 |
| Cooper | 12/13/99–12/29/99 | 403 | $9,478.14 |

## C.

■ Next, UAMS argues that the ALJ was prejudiced because the ALJ conducted an ex parte "pre-hearing meeting" in violation of the Administrative Procedures Act and numerous regulations governing the hearing. That argument is based on the June 19, 2002, affidavit of Jane Hohn stating:

I am the Compliance Officer for University Hospital of Arkansas. I was asked to appear at the hearing before the Administrative Law Judge on July 31, 2001, in the event I was asked to address certain technical aspects of Medicare billing. I arrived at the Office of Hearings and Appeals at approximately 7:45 a.m. I was seated in a waiting area along with Dr. Sidney Hayes and Ms. Barbara Shepherd of Arkansas Blue Cross Blue Shield. At approximately 7:50 a.m., Mr. Troy Patterson, an attorney with the Office of Hearings and Appeals, escorted Dr. Hayes and Ms. Shepherd to the hearing room. At approximately 8:45 a.m., Mr. Patterson escorted myself and others appearing on behalf of the University Hospital of Arkansas to the hearing room. The Administrative Law Judge, Ms. Shepherd and Dr. Hayes were in the hearing room when we entered.

UAMS filed Ms. Hohn's affidavit on appeal, where UAMS argued to the Appeals Board that the ex parte meeting was inappropriate and showed that the ALJ was biased. The Appeals Board held:

Finally, the Council has considered your argument that the ALJ was prejudiced or partial against the hospital-appellant. Our audit of the hearing held on July 31, 2001, reveals that the hearing was conducted appropriately and that you were given ample opportunity to present your case. None of the ALJ's actions or rulings demonstrated any prejudice toward the hospital. The Council also notes that you did not object to the manner in which the hearing was conducted either during the proceedings or in your post-hearing memorandum submitted to the ALJ on September 14, 2001. Moreover, the information contained in Ms. Hohn's affidavit of June 19, 2002, does not establish that the ALJ had any ex parte communications with the representatives of the Medicare contractor.

The Secretary has admitted in this appeal that the ALJ held a "pre-hearing meeting with two Medicare contractor employees," but contends that such meeting is appropriate.

■ Congress banned ex parte communications by administrative law judges and their staff under 5 U.S.C. § 557(d)(1), which provides, in pertinent part:

(d)(1) In any agency proceeding which is subject to subsection (a) of this section, except to the extent required for the disposition of ex parte matters as authorized by law—

(A) no interested person outside the agency shall make or knowingly cause to be made to any member of the body comprising the agency, adminis-

trative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, an ex parte communication relevant to the merits of the proceeding;

(B) no member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, shall make or knowingly cause to be made to any interested person outside the agency an ex parte communication relevant to the merits of the proceeding;

(C) a member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of such proceeding who receives, or who makes or knowingly causes to be made, a communication prohibited by this subsection shall place on the public record of the proceeding:

(i) all such written communications;

(ii) memoranda stating the substance of all such oral communications; and

(iii) all written responses, and memoranda stating the substance of all oral responses, to the materials described in clauses (i) and (ii) of this subparagraph;

(D) upon receipt of a communication knowingly made or knowingly caused to be made by a party in violation of this subsection, the agency, administrative law judge, or other employee presiding at the hearing may, to the extent consistent with the interests of justice and the policy of the underlying statutes, require the party to show cause why his claim or interest in the proceeding should not be dismissed, denied, disregarded, or otherwise ad-versely affected on account of such violation....

5 U.S.C.A. § 557. The Hearings, Appeals and Litigation Law Manual (HALLEX) states, "[t]he ALJ should make every effort to obtain all documentary evidence before the hearing, and to receive the testimony of all potential witnesses at the hearing." HALLEX, § 1–2–1–1. Contrary to the Secretary's argument, this provision does not open the door to ex parte communications between an ALJ and representatives of a Medicare contractor who will testify at a hearing. This provision directs an ALJ to obtain documentary evidence before the hearing but to receive the testimony of all potential witnesses at the hearing. If this provision did open the door to ex parte communications, it would be contrary to 5 U.S.C. § 557(d)(1)(A) and (B) and therefore would be invalid. Basic fairness in the adjudication process requires that behind-the-scenes contacts play no part in the process. *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1543 (9th Cir.1993). "Administrative and judicial adjudications are viable only so long as the integrity of the decisionmaking process remains inviolate. There would be no way to protect the sanctity of the adjudicatory process if we were to condone direct attempts to influence decisionmakers through ex parte contacts." *Id.* (quoting *Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth.*, 685 F.2d 547, 570 (D.C.Cir.1982)).

 Improper ex parte communications do not render an ALJ's proceedings automatically void. When evaluating ex parte communications, the court weighs the gravity of the ex parte communications; whether the contacts may have influenced the agency's ultimate decision; whether the party making the improper contact benefited from the agency's ulti-

mate decision; whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond; and whether vacation of the agency's decision and remand for new proceedings would serve a useful purpose. *Prof'l Air Traffic Controllers Org.*, 685 F.2d at 564–65.

On the one hand, as the Appeals Board noted, UAMS could have raised the issue of the ex parte communication at the July 31, 2001, hearing but did not do so. The ALJ gave UAMS 45 days after the hearing for "[s]ubmitting a brief, or any additional comments you want to make." UAMS did not raise the issue in its post-hearing brief filed on September 17, 2001. UAMS did not raise the issue in the six months between the date of the hearing and the issuance of the ALJ's opinion, though it had ample opportunity to do so. On the other hand, the ALJ did not comply with 5 U.S.C. § 557(d)(1)(C)(ii) because he did not place on the public record of the proceeding memoranda stating the substance of his communications with Dr. Hayes and Ms. Shepherd. The Court will not reverse based solely on the ex parte communication. However, on remand, the case should be assigned to a different ALJ to avoid the appearance of impropriety.

**D.**

Lastly, UAMS argues that it is entitled to payment from the Medicare patients under 42 U.S.C. § 1395u(*l*)(1)(C)(ii). There was testimony that the 12 patients signed an "Advance Beneficiary Notice" that provided, in part, "Services that may be denied include, but are not limited to all hospital services, in-patient and out-patient, professional fees, including all physician services, ancillary services, products and facilities provided by the UAMS, and ACRC." Under the advance beneficiary notice procedure, before providing a service the physician informs the patient that Medicare may not pay and obtains the patient's agreement to pay for the service if Medicare declines to do so. *United Seniors Ass'n, Inc. v. Shalala,* 182 F.3d 965, 973 (D.C.Cir.1999). When a physician furnishes a service that does not meet Medicare's unique criteria for being reasonable and necessary, and the physician has furnished the beneficiary with an advance beneficiary notice, there are no limits on what the physician may charge the beneficiary. Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1999, 63 Fed.Reg. 58,814, 58,851 (Nov. 2, 1998) (to be codified at 42 C.F.R. pt. 405).

The ALJ found that the Medicare patients could not reasonably have known that Medicare had declared their treatment was noncovered. As a result, the ALJ held that the patients' liability for payment was waived. UAMS disagrees.

The record is insufficient for the Court to review this issue. Although a portion of the advance beneficiary notice used here was read during the testimony of one witness, the advance beneficiary notices were not included in the record. The record contains no evidence that the 12 patients were given notice and an opportunity to be heard in this proceeding. None of the 12 was called to testify. Counsel for the Secretary stated during oral argument that if there is something missing from the record that is really important for making a determination in this case, the appropriate procedure would be to remand. Since the record is insufficient for the Court to review this issue, the Court will reverse and remand for further proceedings.

**CONCLUSION**

For the reasons stated above, the Court affirms in part and reverses in part. The decision to deny coverage for the stem cell transplant procedure is affirmed. The de-

cision to deny coverage for the remainder of the services is reversed. Judgment is entered in favor of UAMS in the total amount of $132,900.32. The case is remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED this 1st day of February, 2005.